1  Michael Gerard Fletcher (State Bar No. 070849)
   mfletcher@frandzel.com
2  Gerrick M. Warrington (State Bar No. 294890)
   gwarrington@frandzel.com
3  FRANDZEL ROBINS BLOOM & CSATO, L.C.
   1000 Wilshire Boulevard, Nineteenth Floor
4  Los Angeles, California 90017-2427
   Telephone: (323) 852-1000
5  Facsimile: (323) 651-2577

6  Attorneys for Secured Creditor
   ARCHWAY BROADWAY LOAN SPE, LLC
7

8                **UNITED STATES BANKRUPTCY COURT**

9                **CENTRAL DISTRICT OF CALIFORNIA**

10

| In re | Case No. 2:24-bk-12074-VZ |
|-------|---------------------------|
| Alan Gomperts | Chapter 11 |
| Debtor and Debtor-in-Possession. | **TRANSFER OF CLAIM OTHER THAN FOR SECURITY** |

14        A CLAIM HAS BEEN FILED IN THIS CASE. Transferee hereby gives evidence and

15  notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the

16  claim referenced in this evidence and notice.

| **Name of Transferee:** | **Name of Transferor:** |
|-------------------------|-------------------------|
| Archway Broadway Loan SPE, LLC, a Delaware limited liability company | Archway Real Estate Income Fund I REIT, LLC, a Delaware limited liability company |
| **Name and Address where notices to transferee should be sent:**<br><br>Archway Broadway Loan SPE, LLC<br>c/o Michael Gerard Fletcher<br>Frandzel Robins Bloom & Csato, L.C.<br>1000 Wilshire Boulevard, Nineteenth Floor<br>Los Angeles, California 90017-2427<br>Phone: (323) 852-1000 | Court Claim #: 7<br>Amount of Claim: $16,154,423.25<br>Date Claim Filed: 7/15/24 |

25

26

27

28

| 101415-0002

                                    1

1         I declare under penalty of perjury that the information provided in this notice is true and

2    correct to the best of my knowledge and belief.

3    By: _____    Date: October 3, 2024

4    Bobby Khorshidi
A director of Archway Real Estate

5    Income Fund I REIT, LLC, a Delaware
limited liability company, manager of

6    Archway Broadway Loan SPE, LLC, a
Delaware limited liability company

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

# EXHIBIT A

---

**Fill in this information to identify the case:**

Debtor 1        Alan Gomperts

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: Central District of California

Case number    2:24-bk-12074-VZ

---

Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

---

## Part 1:    Identify the Claim

| | |
|---|---|
| 1. Who is the current creditor? | Archway Real Estate Income Fund I REIT, LLC<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor Archway Real Estate Income Fund I SPE I, LLC |
| 2. Has this claim been acquired from someone else? | ☒ No<br>☐ Yes. From whom? |

| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|---|
| | Frandzel Robins Bloom & Csato, L.C.<br>Attention: Michael Gerard Fletcher<br>Name | Archway Capital<br>Attention: Bobby Khorshidi<br>President & CEO<br>Name |
| | 1000   Wilshire Boulevard, 19th Floor<br>Number      Street | 1875 Century Park East, 9th Floor<br>Number      Street |
| | Los Angeles      CA      90017<br>City           State        ZIP Code | Los Angeles      CA      90067<br>City           State        ZIP Code |
| | Contact phone  (323) 852-1000 | Contact phone  (310) 746-8999 |
| | Contact email  mfletcher@frandzel.com | Contact email  bobby@archwayfund.com |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |

| | |
|---|---|
| 4. Does this claim amend one already filed? | ☒ No<br>☐ Yes. Claim number on court claims registry (if known) _____     Filed on ___ / ___ / ___<br>                                                                          MM   / DD   / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☒ No<br>☐ Yes. Who made the earlier filing? |

---

**Part 2:**    **Give Information About the Claim as of the Date the Case Was Filed**

---

**6. Do you have any number you use to identify the debtor?**

☒ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ _____ _____ _____

---

**7. How much is the claim?**

See Attachment

$ 16,154,423.25

. **Does this amount include interest or other charges?**

☐ No

☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Guaranty of Money Loaned

---

**9. Is all or part of the claim secured?**

☒ No

☐ Yes. The claim is secured by a lien on property.

   **Nature of property:**

   ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

   ☐ Motor vehicle

   ☐ Other. Describe: _____

   **Basis for perfection:** _____

   Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

   **Value of property:**    $_____

   **Amount of the claim that is secured:**    $_____

   **Amount of the claim that is unsecured:**    $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

   **Amount necessary to cure any default as of the date of the petition:**    $ _____

   **Annual Interest Rate** (when case was filed) _____ %

   ☐ Fixed

   ☐ Variable

---

**10. Is this claim based on a lease?**

☒ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

---

**11. Is this claim subject to a right of setoff?**

☒ No

☐ Yes. Identify the property: _____

---

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☒ No | |
| | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $ _____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3:   Sign Below

| | |
|---|---|
| The person completing this proof of claim must sign and date it. FRBP 9011(b). | *Check the appropriate box:* |
| If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. | ☐ I am the creditor.<br>☒ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. |
| **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date  07/ 12 /2024<br>　　　　　　　　　MM / DD / YYYY |

Signature _____

Print the name of the person who is completing and signing this claim:

| | | |
|---|---|---|
| Name | Bobby | Khorshidi |
| | First name            Middle name | Last name |
| Title | Manager of AOL GP, LLC, authorized signer for Archway Real Estate Income Fund I REIT, LLC, fka Archway Real Estate Income Fund I SPE I, LLC | |
| Company | Archway Capital | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | |
| Address | 1875 Century Park East, 9th Floor | |
| | Number        Street | |
| | Los Angeles | CA | 90067 |
| | City | State | ZIP Code |
| Contact phone | (310) 746-8999 | Email | bobby@archwayfund.com |

## ATTACHMENT TO PROOF OF CLAIM

### In re Alan Gomperts

### Case No. 2:24-bk-12074-VZ (Bankr. C.D. Cal.)

---

Archway Real Estate Income Fund I REIT, LLC, fka Archway Real Estate Income Fund I SPE I, LLC ("Archway" or the "Claimant" or the "Creditor") hereby asserts the following claims against debtor Alan Gomperts ("Gomperts" or the "Debtor"):

### I.    SUMMARY AND NATURE OF CLAIM

#### A.    Principal, Interest, and Other Amounts Under the Loan Documents.

As of March 18, 2024 (the "Petition Date"), the debtor Alan Gomperts owes Archway not less than **$16,154,423.25** plus interest (both contract and default interest), late fees, attorney's fees, and costs in amounts according to proof accruing after the Petition Date related to a loan made by Archway to Broadway Avenue Investments, LLC, in July 2021.

This claim amount is composed of the following:

> i.     Principal in an amount not less than $15,241,093.00; plus
>
> ii.    Accrued Interest in an amount not less than $438,393.11; plus
>
> iii.   Default Interest in an amount not less than $392,246.46; plus
>
> iv.    Legal advances in amounts not less than $82,690.68; plus
>
> v.     Attorneys' fees, costs, and other charges in amounts according to proof.

Interest and costs continue to accrue on a daily basis.

The following loan documents, without limitation (collectively, the "Loan Documents" and each a "Loan Document") are attached hereto as Exhibits 1 through 3 and are submitted in support of Archway's secured claims:

**Exhibit 1.:**    Note dated July 21, 2021, executed and delivered by Broadway Avenue Investments, LLC as borrower to and in favor of lender, Archway Real Estate Income Fund I SPE I, LLC.

**Exhibit 2.:**    Continuing Guaranty dated July 2021, executed and delivered by Alan Gomperts, Daniel Halevy and David Halevy, as guarantors borrower to and in favor of lender, Archway Real Estate Income Fund I SPE I, LLC.

**Exhibit 3.:**    Settlement and Loan Modification Agreement dated April 19, 2023, executed and delivered by Broadway Investments LLC, as borrower and Alan Gomperts, Daniel Halevy and David Halevy as guarantors to and in favor of lender, Archway Real Estate Income Fund I SPE I, LLC.

**Exhibit 4.:**    Operating Agreement of Broadway Avenue Investments, LLC.

## II.    BREACHES OF FIDUCIARY DUTY

Archway also asserts an intentional tort claim against debtor Alan Gomperts for his pre-petition and continuing post-petition personal breaches of fiduciary duty owed to Archway as to the loans and extensions of credit ("Broadway Loan") by Archway to Broadway Avenue Investments, LLC ("Broadway") (*See In re Broadway Avenue Investments, LLC*; United States Bankruptcy Court, Central District of California, case no. 2:24-bk-12084-VZ). Gomperts is, and all times material hereto was, a member and the managing member of Broadway. Broadway asserts in its bankruptcy filings that as of the petition date that it values the Broadway real property that is collateral for Archway's Broadway Loan at $11.5 million. At such time, Broadway owed to Archway in excess of $16 million, such that Broadway admits to being insolvent at all material times. Under section 2.1 of the Broadway Operating Agreement (Exhibit 4 hereto) Gomperts had at all material times pre-petition, continuing at all times post-petition, a *mandatory duty* to make a capital call on all members of Broadway in the event that Broadway had financial needs. Gomperts failed, and continues to fail, to do so. Archway is informed and believes and thereupon alleges that Gomperts failures were and are based on his personal decisions to attempt to shield from Broadway's creditors his substantial net worth --- which should have been used to fund his capital call obligations --- while simultaneously shielding the substantial net worth of his fellow member and mother-in-law Sue Halevy. As an officer and manager of an insolvent Broadway entity, Gomperts had and continues to have fiduciary duties to Archway not to benefit himself as to the entity Broadway to the detriment and financial harm of Archway. Gomperts has breached such fiduciary duties owed by to Archway, and continues to breach such duties, under California's Trust Fund Doctrine, making him personally liable in tort to Archway for any and all damages, including for punitive and exemplary damages. *See Berg v. Berg Enterprises*, 178 Cal.App.4th 1020 (2009); *54 Dyer LP v. Ambruso*, 2022 WL 1840344 (C.D. Cal. 2022); *In re Houng*, 499 B.R. 751, 767 (C.D. Cal. 2013).

## III.    ADMINISTRATIVE EXPENSE CLAIMS AND OTHER CLAIMS

This Proof of Claim is without prejudice to claims, if any, that the Claimant has or may have for payment of any administrative expense allowable under Sections 361, 503(b), and/or 507(b) of the Bankruptcy Code or otherwise with respect to any prepetition or postpetition transaction, whether or not such amounts are included in this Proof of Claim, and the right to file such claim or any similar claim at an appropriate time is expressly reserved. Claimant reserves its right to file an additional or amended proof of claim for, among other things, (a) any administrative claim, including for failure of adequate protection, and (b) any postpetition

claim for pre-effective date pendency interest, fees, costs, or charges as provided for under the Loan Documents and applicable law, including 11 U.S.C. § 506(b).

## IV.    ADDITIONAL PROOFS OF CLAIM

This Proof of Claim is filed without prejudice to the filling by, or on behalf of, the Claimant of additional proofs of claim with respect to any other liability or indebtedness of the Debtor or any affiliate of the Debtor.

## V.     NO WAIVER

Filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of the Claimant's rights against any other entity or person liable for all or part of any claim described herein; (b) a waiver of the right to seek to have the reference withdrawn, including, without limitation, with respect to (i) the subject matter of these claims, (ii) any objection or other proceedings commenced with respect thereto, or (iii) any other proceedings commenced in this case against or otherwise involving the Claimant; (c) a waiver of any right to the subordination, in favor of the Claimant, of indebtedness or liens held by creditors of the Debtor; or (d) an election of remedy which waives or otherwise affects any other right or remedy of the Claimant.

## VI.    RESERVATION OF RIGHTS

Creditor reserves the right to amend this proof of claim to, without limitation, add additional Loan Documents, to change the claim amount and components of the claim amount, to include administrative claims, and/or to reflect different and/or additional forms of security for the claim. Any additional or supplemental documentation shall be deemed to have been filed as of the date hereof.

Neither the filing of this Proof of Claim, nor any subsequent appearance, pleading, claim, proof of claim, document, suit, motion, or any other writing or conduct shall be deemed or construed as (i) a consent by Creditor to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Creditor; (ii) a waiver or release of Creditor's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein or therein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related thereto, notwithstanding the designation of such matters as "core" proceedings pursuant to 28 U.S.C. § 157(b)(2), and whether such right to jury trial is pursuant to statute or the United States Constitution; (iii) a consent by Creditor to a jury trial in this Court or any court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (iv) a waiver or release of Creditor's right to have any and all final orders in any and all non-core matters or proceedings entered only after de novo review by a United States District Judge; or (v) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or any other proceeding which may be commenced in this case against or otherwise involving Creditor. This proof of claim is conditional only and is not intended, nor should it be construed, as the

Claimant's consent to jurisdiction in the Central District of California.  Without in any way limiting the foregoing, the Claimant's rights to assert any claim they may have against the Debtor, or against any other  party or property other than the Debtor and the Debtor's estate, are expressly reserved.

# EXHIBIT 1

# PROMISSORY NOTE

$16,942,500.00                                                                                    As of July 21, 2021

FOR VALUE RECEIVED, **BROADWAY AVENUE INVESTMENTS LLC**, a California limited liability company ("*Borrower*"), promises and agrees to pay to the order of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company ("*Lender*"), in lawful money of the United States of America, the principal sum of Sixteen Million Nine Hundred Forty-Two Thousand Five Hundred and No/100 Dollars ($16,942,500.00) (the "*Loan*"), or so much thereof as may be advanced and outstanding under the Loan Agreement of even date herewith between Borrower and Lender (the "*Loan Agreement*"), with interest on the unpaid principal sum owing thereunder at the rate or rates or in the amounts computed in accordance with the Loan Agreement, together with all other amounts due Lender under the Loan Agreement, all payable in the manner and at the time or times provided in the Loan Agreement. Capitalized terms used herein, but not defined, shall have the meanings assigned to them in the Loan Agreement.

If not sooner due and payable in accordance with the Loan Agreement, Borrower shall pay to Lender all amounts due and unpaid under the Loan Agreement dated as of the date hereof, or on any earlier Maturity Date as set forth in the Loan Agreement. Unless otherwise specified in writing by Lender, all payments hereunder shall be paid to Lender at its office located at 16 N. Marengo Avenue, Suite 212, Pasadena, California 91101, Attention: Chuck Ng. Lender reserves the right to require any payment on this Note, whether such payment is a regular installment, prepayment or final payment, to be by wired federal funds or other immediately available funds.

Borrower, co-makers, sureties, endorsers and guarantors, and each of them, expressly waive demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of intent to accelerate the maturity hereof, notice of the acceleration of the maturity hereof, bringing of suit and diligence in taking any action to collect amounts called for hereunder and in the handling of securities at any time existing in connection herewith, ALL OF WHICH ARE HEREBY EXPRESSLY WAIVED BY BORROWER, except as otherwise provided in the Loan Agreement or other Loan Documents; such parties are and shall be jointly, severally, directly and primarily liable for the payment of all sums owing and to be owing hereon, regardless of and without any notice, diligence, act or omission as or with respect to the collection of any amount called for hereunder or in connection with any right, lien, interest or property at any and all times had or existing as security for any amount called for hereunder.

This Promissory Note ("*Note*") evidences a portion of the advances made, interest due and all amounts otherwise owed to Lender under the Loan Agreement. This Note is executed in conjunction with the Loan Agreement and is secured by the liens and security interests created under the Loan Documents (including those arising under the Security Instrument). Reference is made to the Loan Agreement for provisions relating to repayment of the indebtedness evidenced by this Note, including mandatory repayment, acceleration following default, late charges, default rate of interest, limitations on interest, and restrictions on prepayment.

Lender reserves the right, at Lender's sole expense, exercisable in Lender's sole discretion and without notice to Borrower or any other person, to sell participations, to assign its interest or both, in all or any part of this Note or this debt or the debt evidenced hereby.

Borrower agrees to pay an effective rate of interest equal to the sum of the Interest Rate and any additional rate of interest resulting from any other charges of interest or in the nature of interest paid or to be paid in connection with the Loan and any other fees or amounts to be paid by Borrower pursuant to any of the other Loan Documents. Neither this Note, the Loan Agreement nor any of the other Loan Documents shall be

construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law.  It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with all applicable laws governing the maximum rate or amount of interest payable on the Indebtedness evidenced by this Note and the other Loan Documents.  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any interest or other charge or amount provided for in any Loan Document, whether considered separately or together with other charges or amounts provided for in any other Loan Document, or otherwise charged, taken, reserved or received in connection with the Loan, or on acceleration of the maturity of the Loan or as a result of any prepayment by Borrower or otherwise, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate any such violation.  Amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of the Loan without the payment of the Prepayment Premium (or, if the Loan has been or would thereby be paid in full, shall be refunded to Borrower), and the provisions of the Loan Agreement and any other Loan Documents immediately shall be deemed reformed and the amounts thereafter collectible under the Loan Agreement and any other Loan Documents reduced, without the necessity of the execution of any new documents, so as to comply with any applicable law, but so as to permit the recovery of the fullest amount otherwise payable under the Loan Documents.  For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, and any amount paid or agreed to be paid to Lender for the use, forbearance or detention of the Indebtedness, shall be deemed to be allocated and spread ratably over the stated term of the Loan.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Loan.

**WAIVER OF TRIAL BY JURY.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH OF BORROWER AND LENDER (A) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

**THIS WRITTEN NOTE ALONG WITH THE LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

This Note shall be governed by and construed in accordance with the laws of the State of California without regard to conflicts of laws principles.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

737 S Broadway - Promissory Note

EXECUTED as of the date first written above.

**BORROWER:**

**BROADWAY AVENUE INVESTMENTS LLC,**
a California limited liability company

By: _____
Name: Alan Gomperts
Title: Manager

# EXHIBIT 2

## CONTINUING GUARANTY

**ALAN GOMPERTS**, an individual, **DANIEL HALEVY**, an individual, and **DAVID HALEVY**, an individual ("*Guarantor*"), executed this Continuing Guaranty (this "*Guaranty*") on July __, 2021 (the "*Effective Date*") in favor of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC**, a Delaware limited liability company ("*Lender*").

BACKGROUND RECITALS

A.      Lender and **BROADWAY AVENUE INVESTMENTS LLC**, a California limited liability company ("*Borrower*") have entered into the Loan Agreement (the "*Loan Agreement*"), dated as of the date hereof governing (among other things) the Loan in the amount of $16,942,500.00 (the "*Loan*").

B.      The Loan is secured in part by that certain deed of trust lien given by the Borrower to the Lender (the "*Security Instrument*"), and more particularly described in the Loan Agreement. The Security Instrument encumbers Borrower's interest in and to the "Property" described in the Security Instrument (the "*Property*").

C.      Lender would not have entered into the Loan Agreement or made the Loan to Borrower without Guarantor making and delivering this Guaranty.

Therefore, Guarantor (1) acknowledges the receipt and sufficiency of good and adequate consideration for making this Guaranty, and (2) agrees as follows:

1.      Definitions.  Capitalized terms not otherwise defined in this Guaranty will have the meanings set forth in the Loan Agreement.  Within this Guaranty, words of any gender include all other genders and words in the singular number include the plural, unless the context otherwise requires.  The following terms have the following meanings:

"*Bankruptcy Event*" means any of the following events: (i) any Borrower Party files a petition for relief under Applicable Bankruptcy Law; (ii) any party (other than Lender) files an involuntary petition for relief under Applicable Bankruptcy Law against any Borrower Party and such petition is not dismissed within 90 days after being filed; (iii) a court of competent jurisdiction enters an order for relief under any Applicable Bankruptcy Law which is related in any way to a petition filed under (i) or (ii) above; (iv) any Borrower Party, at any time, requests or consents to any composition, rearrangement, extension, reorganization or other relief of any debtor; (v) any Borrower Party (A) is generally not paying its debts as they become due, (B) is insolvent, (C) fraudulently transfers any of its assets to the detriment of any of its creditors, (D) makes an assignment for the benefit of creditors, or (E) admits in writing that it is unable to pay its debts as they become due; or (vi) a receiver, trustee or custodian is appointed for, or takes possession of, all or substantially all of a Borrower Party's assets or any of the Property, either in a proceeding a Borrower Party brings, or any other Person (except for Lender) brings against a Borrower Party, and any such appointment is not discharged or such possession is not terminated within 60 days after commencing, or the Borrower Party consents to or acquiesces in such appointment or possession (unless such consent or acquiescence is in connection with any Lender initiated proceeding). A Bankruptcy Event may exist even if an Event of Default cannot be declared because of Applicable Bankruptcy Law.

"*Conveyance Event*" means that (1) legal or equitable title to any part of, or any interest in, the Collateral is vested in any Person other than Borrower or Lender, or (2) Borrower creates or permits any lien (except for the lien for Taxes which are not delinquent), security interest or other encumbrance against or covering the Collateral.

"*Enforcement Costs*" means all reasonable attorneys' fees, legal expenses and other costs Lender incurs to collect or enforce the Guaranteed Obligations or the Loan Documents.

1

"*Guaranteed Obligations*" means all (a) 100% of the Indebtedness and Interest, and/or (b) the operating costs of the Property, and/or (c) Enforcement Costs, and/or (d) Recourse Amounts.

"*Indebtedness*" means all obligations, liabilities and indebtedness of Borrower arising under the Loan Documents (including all Additional Costs).

"*Interest*" means all accrued and unpaid interest on the Principal Amount.

"*Loan Documents*" means the Loan Agreement, the Security Instrument, the Hazardous Materials Indemnity Agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing Loan Documents.

"*Liquid Assets*" means unencumbered (a) cash on hand or on deposit (including certificates of deposit which mature in less than twelve months) in commercial banks operating in the United States, (b) readily marketable securities issued by the United States, and (c) readily marketable commercial paper rated A-1 by Standard & Poor's Corporation (or a similar rating by any similar organization that rates commercial paper).

"*Recourse Amounts*" any loss, damage, cost, expense, liability, claim or other obligation (including attorneys' fees and costs reasonably incurred), causes of action, suits, claims, demands and judgments of any nature or description whatsoever, which may be imposed upon, incurred by or awarded against Lender or any affiliate thereof as a result of, arising out of or in connection with the following:

(a)     misapplication or misappropriation of Rents, security deposits, or other income, issues, profits and revenues derived from the Property at any time an Event of Default by Borrower exists, provided that any prepaid rent paid more than 1 month in advance as of the date of an Event of Default hereunder by Borrower shall be considered to have been collected after the event of Borrower's default;

(b)     fraud or material misrepresentation of Borrower or Guarantor;

(c)     (i) misapplication or misappropriation of any insurance policies by reason of damages, loss or destruction to any portion of the Property or the Improvements thereon to the full extent of such misapplied or misappropriated proceeds, or (ii) the misapplication or misappropriation of proceeds or awards resulting from the condemnation or taking in lieu of condemnation of any portion of the Property, to the full extent of such misapplied or misappropriated proceeds or awards;

(d)     intentional physical waste of the Property or any portion thereof, and all costs, including reasonable attorney's fees, incurred by Lender to repair or remediate such intentional physical waste, to the full extent of the actual loss incurred by Lender as a result thereof;

(e)     any taxes, assessments or insurance premiums, to the extent not covered by amounts paid into escrow by Borrower to Lender, for which Borrower is liable under the Note, the Security Instrument or any other loan document executed in connection therewith, but only to the extent that Revenue from the Property is sufficient to pay such taxes, assessments or insurance premiums;

737 S Broadway – Guaranty

(f)     failure to pay charges for labor or materials or other charges that can create liens on any portion of the Property;

(g)     loss arising under the Hazardous Materials Indemnity Agreement executed by Borrower in favor of Lender, or Borrower's breach of the hazardous substances covenants, warranties or representation provisions contained in the Security Instrument or other loan documents executed in connection with the Note and Security Instrument, which loss is not caused by Lender after Lender takes title to the Property;

(h)     loss by fire or casualty to the extent not compensated by insurance proceeds collected by Lender;

(i)     any loss resulting from any Guarantor (or any Person comprising any Guarantor), Borrower or any Affiliate of any of the foregoing, in connection with any enforcement action or exercise or assertion of any right or remedy by or on behalf of Lender under or in connection with the Guaranty, the Note, the Security Instrument or any other Loan Document, seeking a defense, judicial intervention or injunctive or other equitable relief of any kind, or asserting in a pleading filed in connection with a judicial proceeding any defense against Lender or any right in connection with any security for the Loan, but only if and to the extent that a court of competent jurisdiction determines that such claims were frivolous (i.e., without any merit) and in bad faith; and

(j)     all costs and fees, including without limitation, reasonable attorneys' fees incurred by Lender in the enforcement of subparagraphs (a) through (j) above.

Notwithstanding the foregoing, Recourse Events shall mean the full amount of the Indebtedness upon the occurrence of either of the following events (the "*Full Recourse Events*"):

(a)     a Bankruptcy Event;

(b)     Borrower fails to obtain Lender's prior consent to any subordinate financing secured by the Property; or

(c)     a Conveyance Event; or

(d)     Borrower fails to comply with the "single purpose entity/separateness" covenants set forth in Section 4.1(b) of the Loan Agreement beyond the expiration of all applicable notice cure periods. and such failure results in (or is cited as a factor by a court of competent jurisdiction) the substantive consolidation of Borrower with another Person; or

(e)     Borrower fails to comply with the cash management provisions set forth in Section 6.1 and Section 6.2 of the Loan Agreement beyond the expiration of all applicable notice cure periods.

"*Transfer Event*" means the conveyance of any Collateral to Lender or another Person through a foreclosure (or deed in lieu), receivership, bankruptcy or other voluntary or involuntary Borrower action.

2.    Inducement. Guarantor has an economic investment or interest in Borrower, and an interest in the success of the Property, and Guarantor will substantially benefit from Lender's agreement to make the Loan to Borrower.

3.    Guaranty. In order to induce Lender to make the Loan to Borrower, Guarantor absolutely, unconditionally and irrevocably guarantees and agrees to pay and perform the Guaranteed Obligations. Notwithstanding anything to the contrary in this Guaranty or any of the other Loan Documents, Guarantor will be liable for all of the Indebtedness and the Enforcement Costs if a Conveyance Event, or a Bankruptcy Event, occurs.

4.    Waivers.

(a)    Guarantor, with respect to the Guaranteed Obligations and the Indebtedness, waives: (i) **PRESENTMENT FOR PAYMENT**; (ii) **DEMAND**; (iii) **NOTICE OF DEMAND, DISHONOR AND NONPAYMENT**; (iv) **NOTICE OF INTENTION TO ACCELERATE**; (v) **NOTICE OF ACCELERATION**; (vi) **NOTICE OF DISPOSITION OF COLLATERAL**; (vii) **THE DEFENSE OF IMPAIRMENT OF COLLATERAL**; (viii) **THE RIGHT TO A COMMERCIALLY REASONABLE SALE OF COLLATERAL**; (ix) **PROTEST AND NOTICE OF PROTEST**; and (x) **AND DILIGENCE IN COLLECTING, AND BRINGING SUIT AGAINST ANY OTHER PARTY**.

(b)    Lender is not obligated to notify Guarantor of (i) Lender's acceptance of this Guaranty, (ii) any credit extended on the faith of this Guaranty, or (iii) Borrower's failure to pay or perform any Indebtedness which constitutes Guaranteed Obligations. Lender is not obligated to use diligence in preserving any Person's liability for the Indebtedness or the Guaranteed Obligations. Lender is not obligated to use diligence in bringing suit to enforce collection, or performance, of the Indebtedness or the Guaranteed Obligations.

(c)    Guarantor waives **ALL DEFENSES GIVEN OR REDUCTIONS IN THE GUARANTEED OBLIGATIONS AVAILABLE TO SURETIES OR GUARANTORS AT LAW OR IN EQUITY** other than the actual payment and performance of the Guaranteed Obligations, including **ALL DEFENSES BASED UPON QUESTIONS AS TO (i) THE VALIDITY, LEGALITY OR ENFORCEABILITY OF THE INDEBTEDNESS OR THE GUARANTEED OBLIGATIONS, OR (ii) THE VALUE OF ANY COLLATERAL**. Guarantor is primarily liable under this Guaranty.

(d)    At any time, Lender may, in its sole discretion, without Guarantor's prior consent, and without impairing, modifying, releasing or otherwise affecting Guarantor's liability under this Guaranty:

(i)    alter, compromise, accelerate, renew, extend, or change the time or manner for the payment of, the Indebtedness;

(ii)    increase or reduce the rate of interest on the Indebtedness;

(iii)    take, surrender, exchange, withdraw, subordinate, alter, modify or eliminate security;

(iv)    (1) add, release, discharge, or (2) settle or compromise with, any Borrower Party or other Person liable for the Indebtedness or the Guaranteed Obligations;

(v)    make any change to the Loan Documents or the manner in which Lender does business with Borrower; or

(vi)    apply any moneys received from Borrower or any other source, or from any security or collateral, in the manner Lender determines, without being required to marshal securities or assets or to apply any part of the moneys or security to any particular part of the Guaranteed Obligations.

Lender is not required to retain, hold, protect, exercise due care with respect thereto, perfect security interests in or otherwise assure or safeguard any security for the Indebtedness or the Guaranteed Obligations; and Guarantor's obligations under this Guaranty and any other Loan Documents will not be affected by, and Guarantor will not have any recourse from, Lender's failure (x) to do any of the foregoing with respect to any security for the Indebtedness or the Guaranteed Obligations, or (y) to exercise or not exercise any right or remedy of Lender under the Loan Documents, at law or in equity.

5.    <u>Guaranty Absolute</u>.  Guarantor's liability under this Guaranty is absolute, and will not be modified, released or impaired, for any reason, including because:

(a)    any Person (including any Borrower Party) dies, or is or becomes incapacitated, disabled, dissolved or terminated;

(b)    Lender fails to file or enforce a claim against the estate (either in administration, bankruptcy or other proceeding) of any Borrower Party or another Person;

(c)    Lender cannot recover the Indebtedness from any Borrower Party or another Person for any reason, including any statute of limitations or Applicable Bankruptcy Law;

(d)    Any Borrower Party or another Person is entitled to any defense, setoff or counterclaim related to the Loan, the Indebtedness or the Guaranteed Obligations;

(e)    a Conveyance Event or a Transfer Event occurs;

(f)    Borrower Party (other than Guarantor) or another Person liable for the payment or performance of Indebtedness or the Guaranteed Obligations is released or discharged by operation of law or otherwise (other than a discharge resulting from the payment of the Indebtedness);

(g)    this Guaranty or any other Loan Document is modified, extended, amended, released or waived; or

(h)    Lender fails to give Guarantor notice of an Event of Default under any Loan Document.

6.    <u>Subordination</u>.  Until the Indebtedness is repaid in full (and including all interest accruing, after any Bankruptcy Event, on the Indebtedness):

(a)    Guarantor subordinates all rights to repayment of any current or future indebtedness from Borrower to Guarantor to Lender's prior right to receive or require payment in full of the Indebtedness.

(b)    Guarantor shall not accept any payment or satisfaction of any indebtedness of Borrower to Guarantor.

(c)    Guarantor shall not accept any security for any indebtedness of Borrower to Guarantor.

(d)    If Guarantor receives any payment, satisfaction or security for any indebtedness of Borrower to Guarantor, then Guarantor shall immediately deliver the payment, satisfaction or security to Lender.  Lender will apply the payment, satisfaction or security as set forth in the Loan Agreement.  Guarantor will hold any payment, satisfaction or security Guarantor receives in trust for Lender until the payment, satisfaction or security is delivered to Lender.

7.    <u>Waiver of Right of Subrogation</u>.  To the fullest extent permitted by Applicable Law, Guarantor waives all rights at law or in equity to seek subrogation, contribution, indemnification or any

737 S Broadway -- Guaranty

other form of reimbursement or repayment from any Borrower Party or any other guarantor of, or any other party secondarily liable for, the payment or performance of the Indebtedness or the Guaranteed Obligations until the Indebtedness has been paid and performed in full. When the Indebtedness has been indefeasibly paid and fully performed, Guarantor will be subrogated to the rights of Lender against Borrower and any endorsers, sureties or other guarantors to the extent of the payments that Guarantor makes on the Guaranteed Obligations.

8.    <u>No Usury</u>. Lender and Guarantor intend that this Guaranty and the other Loan Documents strictly comply with applicable usury law. Therefore, Lender and Guarantor agree that: (i) none of the terms of this Guaranty or the other Loan Documents create a contract to pay for the use, forbearance or detention of money, or interest at a rate in excess of the Maximum Rate; and (ii) no Person (including any Borrower Party) will ever be obligated or required to pay interest on the Indebtedness or any other sums due under the Loan Documents at a rate in excess of the Maximum Rate. Lender expressly disavows any intention to charge or collect excessive unearned interest or finance charges on any portion of the Indebtedness. If at any time the interest received for the Guaranteed Obligations exceeds the Maximum Rate, then Lender will, at its option, either refund to Guarantor the amount of the excess or credit the amount of the excess against the Guaranteed Obligations. Guarantor agrees that the Loan and the Guaranty are not usurious and agrees that if, at any time, Guarantor believes that the Loan or the Guaranty is usurious, it shall give Lender (a) notice of the condition and (b) 60 days in which to make an appropriate refund or other adjustment, if necessary, to correct the condition.

9.    <u>Representations and Warranties</u>. On the Effective Date, Guarantor represents to Lender that:

(a)    Guarantor (i) is solvent, (ii) is not bankrupt and (ii) has no outstanding liens, garnishments, bankruptcies or court actions which could cause Guarantor to become insolvent or bankrupt. No Bankruptcy Event has occurred.

(b)    Each Guarantor financial statement previously delivered to Lender was prepared in accordance with an Approved Accounting Method or GAAP and completely, correctly and fairly presents the financial condition and the results of operations of each Guarantor on the date and for the period covered by the financial statements. All other reports, statements and other data that any Guarantor furnished to Lender in connection with the Loan are true and correct in all material respects and do not omit any fact or circumstance necessary to ensure that the statements are not misleading. Since the date of the last financial statements each Guarantor delivered to Lender, no event, act, condition or liability has occurred or exists, which has had, or may reasonably be expected to have, a material adverse effect upon (a) Guarantor's business, condition (financial or otherwise) or operations, or (b) Guarantor's ability to perform or satisfy, or Lender's ability to enforce, any of the Guaranteed Obligations. For the purposes of <u>Subsection 9(a)</u> and <u>9(b)</u>, "Guarantor" includes any joint ventures, managing member or general partner of Guarantor.

(c)    There are no suits or proceedings (including condemnation) pending, or to Guarantor's knowledge threatened, against or affecting any Guarantor, another Borrower Party or the Collateral, or involving the validity, enforceability or priority of this Guaranty or any of the Loan Documents.

(d)    If Guarantor is not a natural person, then Guarantor: (i) is duly organized, validly existing, and in good standing, under the laws of the jurisdiction of its formation; (ii) is duly qualified, authorized to do business, and in good standing, in every jurisdiction (other than the jurisdiction of its formation) in which it must be qualified; and (iii) has the power and authority to own its other assets and transact its present or proposed business.

(e)    Guarantor has the requisite power and authority to execute, deliver and carry out the terms and provisions of this Guaranty, and has taken all necessary actions to authorize its execution, delivery and performance of the Guaranteed Obligations. Guarantor has duly executed and delivered this Guaranty, and each other Loan Document to which it is a party or under which

6

737 S Broadway – Guaranty

it is obligated.  Each obligation under this Guaranty or any other Loan Document constitutes, Guarantor's legal, valid and binding obligation, enforceable in accordance with the Loan Document's terms, except to the extent enforcement of any Loan Document is subject to the effect of (i) Applicable Bankruptcy Law, or (ii) general principles of equity.

(f)    Guarantor's execution, delivery and performance of this Guaranty and the other Loan Documents, and compliance with the terms and provisions of this Guaranty and the other Loan Documents, will not (i) contravene any Applicable Law, (ii) conflict or be inconsistent with or result in any breach of any term, covenant, condition or provision of, or constitute a default under, the terms of any other instrument to which Guarantor is a party or by which Guarantor is bound or may be subject, or (iii) violate any term of Guarantor's certificate of formation or other documents and agreements governing Guarantor's existence, management or operation.  Guarantor is not required to obtain any Person's consent to execute, deliver or perform this Guaranty or the other Loan Documents.

(g)    Guarantor is intimately familiar with Borrower, the Collateral and Borrower's business operations and financial condition.

10.    <u>Covenants</u>.  Guarantor absolutely and unconditionally covenants that:

(a)    Guarantor shall pay and perform the Guaranteed Obligations even if, for any reason, (i) Borrower does not pay or perform the Indebtedness or any other Borrower obligations under the Loan Documents, or (ii) the Indebtedness or the Guaranteed Obligations are disaffirmed or terminated (except for payment and performance in full).

(b)    Guarantor will remain liable for the Guaranteed Obligations regardless of whether Borrower is (for any reason) liable for any portion of the Indebtedness or the Guaranteed Obligations.

(c)    Guarantor will at all times remain intimately familiar with Borrower, the Collateral and Borrower's business operations and financial condition.

(d)    Guarantor will remain liable for the Guaranteed Obligations regardless of whether Borrower's organizational structure changes.

(e)    Notwithstanding any prior reduction or termination of this Guaranty, Guarantor will remain liable for, and (after Lender's demand) pay to Lender, the amount of any prior Indebtedness payment that Lender must (for any reason) pay to Borrower or any other Person.

(f)    Guarantor will not (i) benefit from, (ii) be able to direct the application of, or (iii) have any right to participate in, any Collateral.

(g)    Guarantor will remain obligated under this Guaranty for the Guaranteed Obligations even if Guarantor loses (for any reason) any right against (i) any Borrower Party or other Person, or (ii) the Collateral.

(h)    Lender is not required to pursue any remedies against any Person or the Collateral before demanding that Guarantor pay or perform the Guaranteed Obligations.

(i)    Lender may maintain an action on this Guaranty without joining any other Borrower Party or bringing a separate action against a Borrower Party.

(j)    Until all Indebtedness is indefeasibly repaid, Guarantor shall maintain (a) at least $2,000,000.00 of Liquid Assets (the "*Liquidity Requirement*"), and (b) a tangible net worth of at least $16,942,500.00 (the "*Net Worth Requirement*").    Guarantor will provide Lender with evidence (which may include a certificate), satisfactory to Lender in its discretion, establishing Guarantor's satisfaction of the Liquidity Requirement and the Net Worth Requirement within 60 days after the end of each calendar quarter.

737 S Broadway – Guaranty

11.    <u>Financial Statements and Reports</u>.    Guarantor shall deliver to Lender all financial statements, reports and certificates, if any, required under the Loan Agreement.

12.    <u>Multiple Guarantors</u>.  If there are more than one Guarantor, then this <u>Section 12</u> is in effect. Unless the context clearly indicates otherwise, all references to "*Guarantor*" mean either or any Guarantor.

(a)    **Joint Liability**.  Lender may sue any Guarantor, jointly or individually, without impairing Lender's rights against each Guarantor under this Guaranty.  Lender may compromise with any Guarantor or any other Person for any sum Lender sees fit.  Lender may release any Guarantor or any other Person from any liability for the Indebtedness or the Guaranteed Obligations without impairing Lender's right to demand and collect the balance of the Indebtedness or the Guaranteed Obligations from any Guarantor or other Person.  No compromise or release will, except as specifically set forth in this Guaranty, impair Guarantors' rights amongst themselves.

(b)    **Disputes**.  Each Guarantor shall indemnify, defend and hold Lender harmless from and against any Claim Lender may suffer arising from any dispute between Guarantors, **INCLUDING THOSE CLAIMS ACTUALLY OR ALLEGEDLY ARISING FROM LENDER'S SOLE, COMPARATIVE OR CONTRIBUTORY NEGLIGENCE, OR STRICT LIABILITY,** unless a court of competent jurisdiction determines in a final non-appealable judgment that the Claim actual resulted from the intentional misconduct or gross negligence of Lender.

13.    <u>Revival and Reinstatement</u>.  This Guaranty remains in full force and effect during any Bankruptcy Event.  Notwithstanding the full payment and performance of the Obligations and the Guaranteed Obligations, this Guaranty will be reinstated in full force and effect immediately upon the occurrence of any Bankruptcy Event. If any prior payment or performance of the Obligations or Guaranteed Obligations is rescinded or reduced, or Lender must otherwise restore or return any prior payment or performance of the Obligations or Guaranteed Obligations, then the Guaranteed Obligations will be reinstated to the extent of the payment or performance actually rescinded, reduced, restored or returned.

14.    <u>Rights Cumulative</u>.  Lender's rights under this Guaranty, at law and in equity are cumulative.  Until the Indebtedness is paid and performed in full and this Guaranty is terminated, Lender may exercise, as many times and as often as Lender elects (in its discretion) any rights under this Guaranty, at law and in equity.  This Guaranty does not diminish or discharge Lender's rights under any prior or future guaranty by Guarantor in favor of Lender.

15.    <u>Notices</u>.  Any notice or communication required or permitted under this Guaranty must be made in writing and sent by (a) personal delivery, (b) expedited delivery service with proof of delivery, or (c) United States Mail, postage prepaid, registered or certified mail, addressed as follows:

To Lender:        Archway Real Estate Income Fund I SPE I, LLC
                  16 N. Marengo Avenue, Suite 212
                  Pasadena, California 91101
                  Attention: Chuck Ng
                  Phone: (310) 779-6505
                  Email: cng@oakhurstfunds.com

with a copy to:   Raines Feldman LLP
                  1800 Avenue of the Stars, 12th Floor
                  Los Angeles, CA 90067
                  Attention: Joshua Mogin
                  Phone: (310) 440-4100
                  Email: jmogin@raineslaw.com

To Guarantor:     Alan Gomperts

8

264 S. Oakhurst Drive
Beverly Hills CA 90212
Phone: (310) 621-5350
Email: alangomperts@hotmail.com

Daniel Halevy
133 S. Palm Drive
Beverly Hills CA 90212
Phone: (310) 467-4703
Email: danhalevy@gmail.com

David Halevy
257 S. Linden Drive
Beverly Hills CA 90212
Phone: (310) 666-2885
Email: danhalevy@gmail.com

with a copy to

Feldman Berman Schwartz LLP
20750 Ventura Blvd., Ste. 201
Woodland Hills, CA 91364
(818) 707-1465 ext. 3
Attention: Craig Berman
cberman@fbsllp.com

or to such other address as Lender or Guarantor may designate in writing and deliver in accordance with this <u>Section</u>. Any change of address will be effective on the 5th Business Day after notice is given pursuant to the terms of this <u>Section</u>. Any notice or communication sent in accordance with this <u>Section</u> will be deemed to be given (i) at the time of personal delivery, or (ii) if sent by delivery service or mail, as of the date of the first attempted delivery at the address and in the manner provided in this <u>Section</u>. Guarantor consents to Lender recording any telephone communications between Lender and Guarantor.

16.    <u>Applicable Law</u>.  The Laws of the **STATE OF CALIFORNIA** (without giving effect to its principles of conflicts of law) and of the **UNITED STATES** will govern and control this Guaranty.  If any provision of this Guaranty or the application thereof to any person or circumstance, for any reason and to any extent, shall be invalid or unenforceable, neither the remainder of this Guaranty nor the application of such provision to any other persons or circumstances shall be affected thereby, but rather the same shall be enforced to the greatest extent permitted by law.

17.    <u>Consent to Forum</u>.  **GUARANTOR IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES COUNTY, CALIFORNIA OVER ANY PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS. BORROWER AGREES THAT, IN ADDITION TO ANY METHOD OF SERVICE UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING RELATING TO THE LOAN DOCUMENTS AND FILED IN ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES COUNTY, CALIFORNIA MAY BE SENT AND GIVEN AS SET FORTH IN <u>SECTION 15</u> ABOVE.**

18.    <u>Waiver of Jury Trial</u>.  **GUARANTOR WAIVES ANY RIGHT TO A JURY TRIAL CONCERNING ANY DISPUTE ARISING FROM OR IN CONNECTION WITH THIS GUARANTY OR ANY OF THE OTHER LOAN DOCUMENTS. GUARANTOR HAS BEEN ADVISED BY COMPETENT COUNSEL IN CONNECTION WITH THIS WAIVER.**

737 S Broadway – Guaranty

19.    Counterparts. The Loan Documents may be executed in any number of counterparts with the same effect as if all signers executed the same instrument. All counterparts of each Loan Document must be construed together and will constitute one instrument.

20.    Modification or Termination.  This Guaranty may only be amended, modified or terminated by a written instrument executed by Lender and Guarantor. Guarantor agrees that it will be bound by any written amendment or modification of the Loan Documents, with or without notice to Guarantor, and Guarantor's obligations under this Guaranty and the other Loan Documents will not be impaired because of any such amendment or modification.

21.    Successors and Assigns; Unenforceability of Certain Provisions, Headings. The terms of this Guaranty are binding on Guarantor and its heirs, devisees, representatives, successors and assigns and inure to the benefit of Lender and all of its transferees, credit participants, successors and assignees. The headings in this Guaranty are for convenience only and will not limit or otherwise affect any of the terms of this Guaranty. If any part of the Loan Documents is unenforceable or invalid, then that part of the Loan Documents will be removed from the Loan Documents. All remaining portions of the Loan Documents will remain enforceable and valid.

22.    Damage Waiver. Guarantor agrees that Lender will not be liable to Guarantor, any other Borrower Party or any other Person for any punitive, exemplary or consequential damages which may actually or allegedly arise from this Guaranty, the Loan, the other Loan Documents or the Collateral, **INCLUDING ANY PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES ACTUALLY OR ALLEGEDLY ARISING FROM THE ORDINARY, CONTRIBUTORY, COMPARATIVE OR SOLE NEGLIGENCE, GROSS NEGLIGENCE OR STRICT LIABILITY, OF ANY BORROWER PARTY OR LENDER**. The foregoing waiver does not limit or otherwise impair the terms of any other waiver or indemnity in the Loan Agreement.

23.    Assignment. Lender may assign, sell or offer to assign or sell interests in the Loan or any portion of the Loan Documents (including this Guaranty) and disseminate to any purchaser, assignee or prospective purchaser or assignee any information Lender has pertaining to the Loan or this Guaranty, including credit information on Borrower Parties and any of their respective principals. If Lender makes any assignment or sells any interest in the Loan or this Guaranty, then Guarantor shall make all modifications, at Lender's or its purchaser's or assignee's expense, to this Guaranty as will facilitate Lender's sale or assignment, provided that no modification will materially add to Guarantor's obligations under this Guaranty or the other Loan Documents.

24.    Imaging. Except for the Note, Lender may image and destroy the executed, original Loan Documents. Except for the Note, Guarantor waives any right it has, or may have in the future, to claim that the imaged copies of the Loan Documents are not originals or the best evidence of the Loan Documents.

25.    Time. Time is of the essence for this Guaranty and the other Loan Documents.

26.    California Provisions. In addition to the waivers set forth elsewhere in this Guaranty:

(a)    Guarantor hereby waives marshaling of assets and liabilities, rights of offset, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any liability to which it applies or may apply, acceleration, presentment, demand for payment, protest, notice of non-payment, notice of dishonor, notice of acceleration, notice of intent to accelerate and all other notices and demands, collection suit or the taking of any other action by Lender.

(b)    Guarantor expressly waives any and all benefits, rights and/or defenses which might otherwise be available to Guarantor under the following sections of the California Civil Code:  Section 2809 (the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal), Section 2810 (a surety is not liable if, for any reason other than the mere personal disability of the principal, there is no liability upon the part of

10

the principal at the time of execution of the contract, or the liability of the principal thereafter ceases), Section 2819 (a surety is exonerated if the creditor alters the original obligation of the principal without the consent of the surety), Section 2822 (a surety's right to have the principal designate the portion of any obligation to be satisfied by the surety in the event that the principal provides partial satisfaction of such obligation), Section 2845 (a surety is exonerated to the extent that the creditor fails to proceed against the principal, or to pursue any other remedy in the creditor's power which the surety cannot pursue and which would lighten the surety's burden), Section 2846 (a surety may compel the principal to perform the obligation when due), Section 2847 (if a surety satisfies the principal obligation, or any part thereof, the principal is obligated to reimburse the surety for the amounts paid by the surety), Section 2850 (whenever the property of a surety is hypothecated with property of the principal, the surety is entitled to have the property of the principal first applied to the discharge of the obligation), Section 2899 (where one has a lien upon several things, and other persons have subordinate liens upon, or interests in, some but not all of the same things, the person having the prior lien, if he can do so without risk of loss to himself, or of injustice to other persons, must resort to the property in a certain order, on the demand of any party interested) and Section 3433 (where a creditor is entitled to resort to each of several funds for the satisfaction of his claim, and another person has an interest in, or is entitled as a creditor to resort to some, but not all of them, the latter may require the former to seek satisfaction from those funds to which the latter has no such claim, so far as it can be done without impairing the right of the former to complete satisfaction, and without doing injustice to third persons).

(c)    Guarantor expressly agrees not to exercise or take advantage of any rights, benefits and/or defenses which might be available to Guarantor under the following California Civil Code Sections, unless and until the Guaranteed Obligations shall have been indefeasibly paid and satisfied in full:   Section 2839 (performance of the principal obligation, or an offer of such performance, duly made as provided in the Civil Code, exonerates a surety), Section 2848 (a surety, upon satisfaction of the obligation of the principal, is entitled to enforce remedies which the creditor then has against the principal and to pursue his co-sureties or other third parties after the surety has satisfied the underlying debt, or at least more than his share of it), and Section 2849 (a surety is entitled to the benefit of security held by the creditor for the performance of the principal obligation held by the creditor).

(d)    Guarantor waives any defense that Guarantor may have by reason of the failure of Lender to provide Guarantor with any material facts about Borrower, including any information respecting the financial condition of Borrower, Borrower's ability to perform the Loan obligations or the sufficiency of Lender's security.

(e)    Guarantor waives any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other Person, or the failure of Lender to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other person or persons.

(f)    Guarantor waives all rights of indemnification and contribution and any other rights and defenses that are or may become available to Guarantor by reason of Sections 2787 to 2855, inclusive, of the California Civil Code.  Guarantor hereby waives the benefits of any right of discharge under any and all statutes or other laws relating to guarantors or sureties and any other rights of guarantors or sureties thereunder.

(g)    Guarantor waives all rights and defenses that Guarantor may have because the debtor's (Borrower's) debt is secured by real property.  This means, among other things:

11

737 S Broadway – Guaranty

(i)      The creditor (Lender) may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by the debtor.

(ii)     If the creditor forecloses on any real property collateral pledged by the debtor: (A) the amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (B) the creditor may collect from Guarantor even if the creditor, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from the debtor.

(h)      This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because the debtor's debt is secured by real property.  These rights and defenses include, but are not limited to, any rights or defenses based upon Sections 580a, 580b, 580d or 726 of the Code of Civil Procedure.  Guarantor waives all rights and defenses arising out of an election of remedies by the creditor, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal (Borrower) by the operation of Section 580d of the Code of Civil Procedure or otherwise.  Any summary of statutory provisions is for convenience only, and Guarantor has read and is familiar with the entirety of such provisions.

27.      Entire Agreement.   The Loan Documents constitute the entire understanding and agreement between Borrower, Guarantor and Lender with respect to the transactions arising in connection with the Loan and this Guaranty.  The Loan Documents supersede all prior written or oral understandings and agreements between Borrower, Guarantor and Lender with respect to the Loan and this Guaranty.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK SIGNATURE PAGE FOLLOWS]**

12

Guarantor has executed this Guaranty to be effective on the Effective Date.

**GUARANTOR:**

_____
**ALAN GOMPERTS**, an individual

_____
**DANIEL HALEVY**, an individual

_____
**DAVID HALEVY**, an individual

# EXHIBIT 3

## SETTLEMENT AND LOAN MODIFICATION AGREEMENT

This SETTLEMENT AND LOAN MODIFICATION AGREEMENT ("Agreement"), is dated as of April 19, 2023, by and among BROADWAY AVENUE INVESTMENTS LLC, a California limited liability company ("Borrower"), ALAN GOMPERTS ("Alan"), an individual, DANIEL HALEVY ("Daniel"), an individual, and DAVID HALEVY ("David"), an individual together with Alan and Daniel, collectively and individually hereinafter referred to as "Guarantor"), on the one hand, and ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC, a Delaware limited liability company ("Lender"), on the other hand, with respect to the following facts, matters and issues. Borrower and Guarantor together when referred to with Lender shall be collectively hereinafter referred to as the "Parties."

## RECITALS

A.      Lender has heretofore made a loan (the "Broadway Loan") to Borrower in the original maximum principal sum of Sixteen Million Nine Hundred Forty-Two Thousand Five Hundred and No/100 Dollars ($16,942,500.00) evidenced by, among other things, (i) that certain Promissory Note dated July 21, 2021 (together with any and all amendments thereto or modifications thereof, the "Note"), in the original principal face amount of $16,942,500.00, executed by Borrower to and in favor of Lender, and (ii) that certain Loan Agreement dated July 21, 2021, by and between Borrower and Lender (together with any and all amendments thereto or modifications thereof, the "Loan Agreement").

B.      As security for, among other things, the indebtedness and obligations under the Broadway Loan, Borrower, as trustor, executed and delivered to and in favor of Lender, as beneficiary, that certain  Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated July 23, 2021, and recorded on July 26, 2021, as Instrument No. 20211142009 in the Official Records of Los Angeles County, California (together with any and all amendments thereto or modifications thereof, the "Deed of Trust"), encumbering, without limitation, certain real property more particularly described in **Exhibit "A"** attached hereto and incorporated herein by this reference (as more particularly described therein, the "Property").

C.      Payment and performance of Borrower's indebtedness and obligations in connection with the Broadway Loan was and is guaranteed by Guarantor pursuant to a Continuing Guaranty executed by Guarantor and dated as of July 21, 2021 (the "Continuing Guaranty").

D.      Pursuant to the Deed of Trust, Borrower granted to and in favor of Lender a first priority security interest in and lien upon certain real and personal property described in the Deed of Trust (the "Deed of Trust Collateral"), to secure, without limitation, payment and performance of the indebtedness and obligations under and in connection with the Broadway Loan and the Note.  The Deed of Trust Collateral and any other collateral securing the indebtedness and obligations under the Broadway Loan shall be collectively referred to as the "Collateral." Lender's security interest in the Collateral was and is perfected under applicable law.

E.      This Agreement, the Note, Loan Agreement, Deed of Trust, Continuing Guaranty, and all other agreements, instruments and other documents executed by Borrower or Guarantor

in connection with the Broadway Loan shall at times hereinafter be referred to collectively as the "Broadway Loan Documents." Any and all terms used but not defined herein shall have the meanings ascribed to them in the Loan Agreement.

F.    Lender alleges that Borrower and Guarantor defaulted under the terms of the Broadway Loan Documents by, among other things, failing to obtain a certificate of occupancy for the Property by January 21, 2022 and failing to pay the Loan off in full as of August 1, 2022, the maturity date (collectively hereinafter the "defaults").

G.    On September 28, 2022, Lender filed its Verified Complaint for Breach of Guaranty against Guarantor in the Los Angeles County Superior Court entitled *Archway Real Estate Income Fund I SPE I, LLC, Plaintiff v. Alan Gomperts, et al., Defendants* Case Number 22STCV31742 (the "Litigation").

H.    On August 30, 2022, Lender caused to be commenced non-judicial foreclosure proceedings through the filing of a notice of default ("NOD") as instrument no. 20220859022 in the Official Records of Los Angeles County, California. The NOD is still pending.

I.    The Parties now desire to modify the Broadway Loan Documents, resolve and settle the Litigation, and rescind the NOD, subject to the terms and conditions set forth herein.

## AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

1.    Recitals. The recitals are incorporated herein by this reference as are all exhibits attached hereto. Borrower and Guarantor, and each of them, represent and warrant to Lender that the factual information recited above is true and correct. Except as specified herein, all of the terms and conditions of the Broadway Loan Documents, and each of them, shall remain in full force and effect. In the event of any conflict or inconsistency between the terms, conditions, and provisions of this Agreement and the Broadway Loan Documents, the terms, conditions, and provisions of this Agreement shall prevail.

2.    Reaffirmation. This Agreement is, in part, a reaffirmation of the obligations and indebtedness of Borrower and Guarantor to Lender as evidenced by the Broadway Loan Documents. Therefore, Borrower and Guarantor each represent, warrant, covenant, and agree, that except as specified herein, all of the terms and conditions of the Broadway Loan Documents are in full force and effect, without waiver or modification of any kind whatsoever, and are ratified and confirmed in all respects.

3.    Acknowledgments.

A.    Borrower and Guarantor, and each of them, acknowledge the validity, priority and extent of the Broadway Loan Documents and acknowledge that the following sums are owed to the Lender as of April 19, 2023:

| | | | |
|---|---|---|---|
| (1) | Principal balance in the amount of | $16,942,500.00 | |
| (2) | Non-default interest in the amount of | $1,171,385.63 | |
| (3) | Default interest ("Default Interest") in the amount of | $1,656,129.46 | |
| (4) | Late charges ("Late Charges") in the amount of | $0.00 | |
| (5) | Legal and Trustee fees and costs ("Legal/Trustee Fees') in the amount of | $65,000.00 | (FRBC) |
| | | $30,000.00 | (TC) |
| | | $16,489.00 | (Trustee) |
| (6) | GRAND TOTAL ("Amounts Owed") | $19,881,504.09 | |

In addition, interest continues to accrue at the rate of $8,471.25 per day, inclusive of default interest (the "Per Diem").

B.    Borrower and Guarantor, and each of them, acknowledge and confirm that neither Borrower nor Guarantor has any valid offset or defense to the Amounts Owed, obligations, and liability under the Broadway Loan Documents.

4.    New Loans.

A.    Concurrently with the execution of this Agreement, Lender shall make three (3) new loans in the aggregate amount of $4,000,000.00 (collectively, "New Loans"), as follows:

(1)    A loan to _Negev Investments, LLC ("Negev") in the principal amount of One Million Three Hundred Thousand and No/100 Dollars ($1,300,000.00) ("Negev Loan"), secured by the real property commonly known as 12800 Foxdale Drive, Desert Hot Springs, California ("Foxdale Property") and guaranteed by David.  The guaranty shall be secured by his membership interest in Negev.  The documents and instruments evidencing the Negev Loan are identified in Exhibit "B-1" attached hereto;

(2)    A loan to SLA Investments, LLC ("SLA") in the principal amount of One Hundred Twenty-Five Thousand and No/100 Dollars ($125,000.00) ("SLA Loan"), secured by the real property commonly known as 1040 S. Los Angeles Street, Los Angeles, California ("Los Angeles Property") and guaranteed by David, Sue Halevy ("Sue"), Alan, Sharon Gomperts a/k/a Sharon Halevy ("Sharon") and Daniel.  The guaranty shall be secured by David, Sue, Alan, Sharon and Daniel's membership interest in SLA.  The documents and instruments evidencing the SLA Loan are identified in Exhibit "B-2" attached hereto; and

(3)    A loan to David, David Halevy and Sue Halevy, as trustees of the Halevy Family Trust dated September 6, 2010 ("D&S Trust"), Alan, Alan Gomperts and Sharon Gomperts, as trustees of the Gomperts and Halevy Family Trust ("G&H Trust") and Daniel in the principal amount of Two Million Five Hundred Seventy-Five Thousand and No/100 Dollars

($2,575,000.00) ("Guarantor Loan"), secured by the real property commonly known as 3538 Greenfield Avenue, Los Angeles, California, owned by G&H Trust, 133 S. Palm Drive, Beverly Hills, California, owned by D&S Trust, and 8561 Horner Street, Los Angeles, California, owned by Daniel. The documents and instruments evidencing the Guarantor Loan are identified in Exhibit "B-3" attached hereto.

B.    The proceeds of the New Loans ("New Loans Proceeds") shall be disbursed and allocated as provided in the Negev Loan, SLA Loan and Guarantor Loan, as more particularly described in Exhibit "C" attached hereto, and shall be used for the creation of an interest reserve for the New Loan, payment of past due amounts owed by Broadway to Lender under the Broadway Loan Documents, creation of an interest reserve for the Broadway Loan and to pay certain fees and costs. To the extent that the New Loans Proceeds are insufficient to make all payments or deposits required pursuant to this Agreement, the Negev Loan, SLA Loan and Guarantor Loan, or any of them, Guarantor shall be required to do so, from their own funds, concurrently with the Settlement Closing (as herein defined).

5.    Amendments to Broadway Loan.

Upon Settlement Closing:

A.    The Maturity Date under the Broadway Loan shall be extended to December 1, 2023, at which time the entire principal balance under the Broadway Loan plus all accrued and unpaid interest thereon shall be due and payable as provided under the Broadway Loan Documents. From and after the Settlement Closing, any and all references in the Note, Loan Agreement, and the other Broadway Loan Documents to a maturity date of "August 1, 2022" shall be replaced with "December 1, 2023."

B.    The obligations of Borrower to obtain the Certificate of Occupancy on the Property no later than January 21, 2022 pursuant to Section 5.1(a) of the Loan Agreement is hereby amended to be required as soon as is reasonably practicable in the best efforts of Borrower, but in any event no later than the Maturity Date.

6.    Interest Reserve Deposit. Concurrently with the Settlement Closing, Guarantor shall deposit the sum of $892,874.03 (the "Interest Reserve Shortfall") into the Interest Reserve. The Interest Reserve Shortfall shall not bear interest. Borrower continues to authorize Lender, on a monthly basis, to disburse from the Interest Reserve the amount of interest accrued and unpaid to Lender under the terms of Section 12(b) of the Loan Agreement without further authorization on the part of Borrower. Such disbursements by Lender may be made by such means (including, as shall be satisfactory to Lender, in its sole and absolute discretion. Notwithstanding the Interest Reserve, Borrower remains liable and obligated to pay all accrued and unpaid interest when it is due and payable, in the event that the amounts in the Interest Reserve are insufficient to do so.

7.    Conditions Precedent to Settlement Closing. The obligations of Lender hereunder are expressly conditioned upon the following having occurred, or Lender having received on or prior to April 19, 2023 ("Settlement Closing"), all of the following amounts, documents, and

instruments in form and content satisfactory to Lender, in its sole and absolute discretion, opinion, and judgment:

    A.    This Agreement, fully executed by Borrower and Guarantor;

    B.    The closing of the Negev Loan;

    C.    The closing of the SLA Loan;

    D.    The closing of the Guarantor Loan;

    E.    Payment of the Legal/Trustee Fees;

    F.    Payment and/or deposit of any additional monies required pursuant to Section 6, above;

    G.    At Borrower's expense, endorsements to Lender's existing policy of title insurance insuring the continuing priority of the lien of the Deed of Trust in a first priority position; and

    H.    A Memorandum of Modification to the Deed of Trust, fully executed by Borrower and notarized for recording purposes.

    8.    <u>Rescission of NOD; Dismissal of Action</u>.  Upon the Settlement Closing:

    A.    Lender will cause the NOD to be rescinded, subject to the right of Lender to cause to a new notice of default to be recorded in the event there is any default under this Agreement or any of the other Broadway Loan Documents subsequent to the Settlement Closing. Further, as long as there is no default under this Agreement or any of the other Broadway Loan Documents from and after the date of this Agreement, interest on the Broadway Loan shall accrue and be payable at the non-default rate of interest provided for in the Note.  Furthermore, upon the Settlement Closing, Lender shall waive its right to collect the Default Interest and Late Charges.

    B.    Lender will cause to be filed with the Court a dismissal without prejudice of the Litigation, subject to the right of Lender to commence a new action or proceeding against Guarantor and any other parties, as determined by Lender, if there is a default under this Agreement or any of the other Broadway Loan Documents by which Guarantor is bound.

    9.    <u>Representations and Warranties of Borrower and Guarantor</u>.  Borrower and Guarantor hereby represent and warrant to Lender and covenant and agree with Lender as follows:

    A.    Borrower and Guarantor, and each of them, have full legal right, power and authority to enter into and perform this Agreement.  The execution and delivery of this Agreement by Borrower and Guarantor and the consummation by Borrower and Guarantor of the transactions contemplated hereby have been duly authorized by all necessary action by or on behalf of Borrower and Guarantor.  This Agreement is a valid and binding obligation of

Borrower and Guarantor, enforceable against Borrower and Guarantor in accordance with its terms.

B.     Neither the execution and delivery of this Agreement by Borrower and Guarantor, or either of them, nor the consummation by Borrower and Guarantor of the transactions contemplated hereby, conflicts with or constitutes a violation or a default under any law applicable to Borrower and Guarantor, or either of them, or any contract, commitment, agreement, arrangement or restriction of any kind to which Borrower or Guarantor is a party, by which Borrower or Guarantor is bound or to which any of Borrower's or Guarantor's property or assets is subject.

C.     There are no actions, suits or proceedings pending, or to the knowledge of Borrower or Guarantor, threatened against or affecting Borrower or Guarantor, in relation to its obligations to Lender or involving the validity and enforceability of this Agreement, or any of the other Broadway Loan Documents, as applicable, at law or in equity, or before or by any Governmental Agency, or which could have a material adverse effect on the financial condition, operations, properties, assets, liabilities or earnings of Borrower or Guarantor, or the ability of Borrower or Guarantor to perform their obligations to Lender.

D.     Borrower and Guarantor, and each of them, hereby reaffirm and confirm that the representations and warranties of Borrower and Guarantor, and each of them, contained in the Broadway Loan Documents are true, correct and complete in all material respects as of the date of this Agreement.

   10.   Revival of Obligation.

A.     Borrower and Guarantor acknowledge and agree that in the event that the payment of money, this Agreement, or the grant of collateral should for any reason subsequently be declared to be "fraudulent" or "voidable" within the meaning of any state, federal or foreign law relating to fraudulent conveyances, preferential or otherwise voidable or recoverable, in whole or in part, for any reason, under the United States Bankruptcy Code or any other federal, foreign or state law (collectively referred to herein as "Voidable Transfer"), and Lender is required to pay or restore any such Voidable Transfer, or any portion thereof, then as to that which is repaid or restored pursuant to any such Voidable Transfer (including all costs, expenses and attorneys' fees of Lender related thereto, including, without limitation, relief from stay or similar proceedings), the liability of Borrower and Guarantor to Lender shall automatically be revived, reinstated and restored as though such Voidable Transfer had never been made to Lender.

B.     Nothing set forth herein is an admission that such Voidable Transfer has occurred.  Borrower and Guarantor expressly acknowledge that Lender may rely upon advice of counsel, and if so advised by counsel, may, in the exercise of Lender's sole opinion and judgment, settle, without defending, any action to void any alleged Voidable Transfer, and that upon such settlement, Borrower and Guarantor shall again be liable for any deficiency resulting from such settlement as provided in this Agreement.

   11.   Waiver of Certain Bankruptcy Rights.

Borrower and Guarantor acknowledge and agree that but for Lender entering into this Agreement with Borrower and Guarantor, Lender would have continued to diligently pursue all of its rights and remedies under the Broadway Loan Documents, at law and in equity, against Borrower and Guarantor. As an additional inducement to and material consideration for Lender agreeing to the modifications and extension provided in this Agreement, Borrower and Guarantor agree that in the event a Bankruptcy or Judicial Action (as hereinafter defined in this Section 11) is commenced which subjects Lender to any stay in the exercise of Lender's rights and remedies under the Broadway Loan Documents with respect to the Collateral, including, but not limited to, the automatic stay imposed by Section 362 of the United States Bankruptcy Code (individually and collectively, "Stay"), then Borrower and Guarantor irrevocably consent and agree that such Stay shall automatically be lifted and released against Lender with respect to the Collateral, and Lender shall thereafter be entitled to exercise all of its rights and remedies under the Broadway Loan Documents with respect to the Collateral, subject, however, to the terms and conditions of this Agreement. Borrower and Guarantor acknowledge that each is knowingly, voluntarily, and intentionally waiving each of such party's rights to any Stay and agrees that the benefits provided to Borrower and Guarantor under the terms of this Agreement are valuable consideration for such waiver. As used in this Section 11, the term "Bankruptcy or Judicial Action" shall mean any voluntary or involuntary case filed by or against Borrower and Guarantor, or either of them, under the United States Bankruptcy Code, or any voluntary or involuntary petition in composition, readjustment, liquidation, or dissolution, or any state and federal bankruptcy law action filed by or against Borrower and Guarantor, or either of them, any action where Borrower and Guarantor, or either of them, are adjudicated as bankrupt or insolvent, any action for dissolution of Borrower and Guarantor, or either of them, or any action in furtherance of any of the foregoing, or any other action, case, or proceeding that has the effect of staying (or in which a stay is being obtained against) the enforcement by Lender of its rights and remedies with respect to the Collateral under the Broadway Loan Documents.

12.    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of Borrower and Guarantor and their respective successors, assigns, directors, officers, shareholders, partners, accountants, heirs, executors, administrators, trustees and trustees in bankruptcy.

13.    Release by Borrower and Guarantor.

A.    Borrower and Guarantor, on behalf of themselves, their respective successors and assigns, and each of them, do hereby forever relieve, release, acquit and discharge Lender and its predecessors, successors and assigns, and their respective past and present attorneys, accountants, insurers, representatives, affiliates, partners, subsidiaries, officers, employees, directors, and shareholders, and each of them (collectively, the "Released Parties"), from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions and causes of action, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, which Borrower and Guarantor, or either of them, now own or hold or have at any time heretofore owned or held or may at any time hereafter own or hold against the Released Parties, or any of them, by reason of any acts, facts, transactions or any circumstances whatsoever occurring or existing, in whole or in part, on or before the date of this Agreement, including, but not limited to, those based upon, arising out of, appertaining to, or

in connection with the Recitals above, the Loan, the facts pertaining to this Agreement, any collateral heretofore granted to Lender or granted in connection herewith, or to any other obligations of Borrower and Guarantor, or either of them, to Lender, or the lending arrangements between Lender and Borrower and Guarantor, all individually and collectively.

> (1)    As to the matters released herein, Borrower and Guarantor expressly waive any and all rights under Section 1542 of the Civil Code of the State of California, which provides as follows:

> > "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that if known by him or her, would have materially affected his or her settlement with the debtor or released party."

> (2)    Borrower and Guarantor expressly waive and release any right or benefit which they have or may have under Section 1542 of the Civil Code of the State of California, and any similar law of any state, territory, commonwealth or possession of the United States, or the United States, to the full extent that they may waive all such rights and benefits pertaining to the matters released herein.  In connection with such waiver and relinquishment, Borrower and Guarantor acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true.  Nevertheless, it is the intention of Borrower and Guarantor, through this Agreement, to fully, finally and forever release all such matters, and all claims relative thereto, which do now exist, may exist, or heretofore have existed.  In furtherance of such intention, the release herein given shall be and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

> B.    Borrower and Guarantor are the sole and lawful owners of all right, title and interest in and to every claim and other matter which they purport to release herein, and they have not heretofore assigned or transferred, or purported to assign or transfer to any person or any entity claims or other matters herein released.  Borrower and Guarantor shall indemnify, defend and hold Lender and each of the other Released Parties, and each of them, harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, costs, and expenses (including, but not limited to, attorneys' fees), based upon or arising in connection with any such prior assignment or transfer, or any such purported assignment or transfer, or any claims or other matters released herein.

14.    <u>No Joint Venture, Management or Control</u>.  Notwithstanding any provision of this Agreement and/or of the Broadway Loan Documents:

> A.    Lender is not and shall not be construed to be a partner, joint venture, alter ego, manager, controlling person or other business associate or participant of any kind of Borrower, Guarantor or any other Person;

B.      Lender shall not be deemed responsible to perform or participate in any acts, omissions, or decisions of Borrower or Guarantor; and

C.      Borrower and Guarantor, or either of them, do not have any claims, causes of action or defenses to their obligations to Lender based on any allegations of management or control exercised by Lender. Borrower and Guarantor, and each of them acknowledge and agree that Lender does not manage or control them in any way.

15.    <u>No Further Commitments to Lend</u>**.**      Borrower and Guarantor agree and acknowledge that Lender will not and has no obligation to advance, provide or loan any further or additional monies or credit to Borrower and the obligation of Lender to advance any further sums to Borrower under the Broadway Loan Documents has been terminated thereunder. Borrower and Guarantor further agree and acknowledge that Lender will not and has no obligation to further extend the time for payment of any obligations owing to or arising in favor of Lender by Borrower and Guarantor, or either of them.

16.    <u>Miscellaneous.</u>

A.      Section headings used in this Agreement are for convenience only and shall not affect the construction of this Agreement.

B.      This Agreement may be executed in one or more counterparts but all of the counterparts shall constitute one agreement; provided, however, this Agreement shall not be effective and enforceable unless and until it is executed by all parties hereto.

C.      This Agreement and the other documents and instruments executed in connection therewith constitute the product of the negotiation of the parties hereto and the enforcement hereof shall be interpreted in a neutral manner, and not more strongly for or against any party based upon the source of the draftsmanship hereof.

D.      This Agreement is not a novation, nor, except as expressly provided in this Agreement, is it to be construed as a release or modification of any of the terms, conditions, warranties, waivers or rights set forth in the Broadway Loan Documents.  Nothing contained in this Agreement shall be deemed to constitute a waiver by Lender of any required performance by Borrower and Guarantor, or either of them, of any default heretofore or hereafter occurring under or in connection with the other Broadway Loan Documents.  In the event there is a conflict in any term, condition or provision of this Agreement, on the one hand, and the Loan Agreement or any of the other Broadway Loan Documents, on the other hand, the terms, conditions and provisions of this Agreement are to control.

E.      Borrower and Guarantor hereby further represent and warrant as follows:

(1)      Borrower and Guarantor have received, or have had the opportunity to receive, independent legal advice from attorneys of each of their choice with respect to the advisability of executing this Agreement and prior to the execution of this Agreement by Borrower and Guarantor, their attorneys reviewed this Agreement and discussed this Agreement with them and have made all desired changes;

(2)    Except as expressly stated in this Agreement, neither Lender nor any other person or entity has made any statement or representation to Borrower or Guarantor regarding facts relied upon by Borrower or Guarantor;

(3)    Borrower and Guarantor do not rely upon any statement, representation or promise of Lender or any other person or entity in executing this Agreement except as expressly stated in this Agreement;

(4)    The terms of this Agreement are contractual and not a mere recital;

(5)    This Agreement has been carefully read by, the contents hereof are known and understood by, and it is signed freely by Borrower; and

(6)    This Agreement and the releases contained herein are intended to be final and binding against Borrower and Guarantor, and Borrower and Guarantor acknowledge that Lender is expressly relying on the finality of this Agreement as a substantial, material factor inducing Lender's execution of this Agreement.

F.    This Agreement and any and all documents executed in connection herewith are entered into and made to be performed in Los Angeles County, California, and in the event that litigation is instituted in connection with this Agreement, and any and all documents executed in connection herewith, it shall be instituted in the Courts for Los Angeles County, California.  This Agreement shall be construed under the laws of the State of California.

G.    Upon indefeasible payment and performance in full of the Broadway Loan Documents, Lender shall provide Borrower the Limited Release in the form of Exhibit "D" attached hereto.

H.    The waiver of any existing or future default by any party to this Agreement or of any of the terms of this Agreement shall not be deemed a waiver of any future default or term.  No waiver of any other provisions hereof shall be deemed or constitute a waiver of any other provision, and no waiver of any type shall be binding unless evidenced by a writing signed by the party making waiver.

17.    JUDICIAL REFERENCE – The parties hereby agree that any claims, controversies, disputes, or questions of interpretation, whether legal or equitable, arising out of, concerning or related to this Agreement and ANY MATTER RELATED THERETO, shall be heard by a single referee by consensual general judicial reference pursuant to the provisions of California Code of Civil Procedure sects 638 et seq., who shall determine all issues of fact or law and to report a statement of decision. The referee shall also have the power to hear and determine proceedings for ancillary relief, including, but not limited to, applications for attachment, issuance of injunctive relief, appointment of a receiver, and/or claim and delivery.  The costs of the proceeding shall be borne equally by the parties to the dispute, subject to the discretion of the referee to allocate such costs based on a determination as to the prevailing party(ies) in the proceeding.  Notwithstanding the foregoing, the judicial reference provided herein shall not apply to the New Loans.  ***By initialing below the parties acknowledge that they have read and understand the foregoing Judicial Reference provisions and understand that they are waiving their right to a jury trial.***

The parties below have initialed this section to further indicate their awareness and acceptance of each and every provision hereof.

_____        _____        _____
Borrower's Initials            Alan's Initials                Daniel's Initials

_____        _____        _____
David's Initials               Guarantor's Initials           Lender's Initials

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and year first written above.

**BORROWER:**

BROADWAY AVENUE INVESTMENTS LLC.
a California limited liability company

By: _____
Name: Alan Gomperts
Its: Manager

**GUARANTOR:**

_____
ALAN GOMPERTS, an individual

_____
DANIEL HALEVY, an individual

_____
DAVID HALEVY, an individual, by Daniel Halevy as his attorney in fact

**LENDER:**
ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,
A Delaware limited liability company

By: _____
Name: Bobby Khorshidi
Title: Authorized Signer

## EXHIBIT "A"
## LEGAL DESCRIPTION

THE LAND REFERRED TO IS SITUATED IN THE COUNTY OF LOS ANGELES, CITY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

THAT PORTION OF BLOCK 25 OF THE HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2, PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE NORTHWESTERLY LINE OF BROADWAY, 80 FEET WIDE, WITH THE DIVIDING LINE ESTABLISHED BY AGREEMENT AND DEED BETWEEN THE LOS ANGELES TRUST COMPANY AND NIAGARA BUILDING COMPANY, RECORDED DECEMBER 11, 1908 IN BOOK 3568, PAGE 93 OF DEEDS, RECORDS OF SAID COUNTY, SAID INTERSECTION BEING DISTANT NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 180.47 FEET, MORE OR LESS, FROM THE NORTHERLY LINE OF 8TH STREET, 60 FEET WIDE, AS SHOWN ON MAP OF A RESUBDIVISION OF A PORTION OF BLOCK 25, HUBER TRACT, RECORDED IN BOOK 5, PAGE 15 OF MAPS, IN THE OFFICE OF SAID COUNTY RECORDER; THENCE NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 60 FEET, MORE OR LESS, TO THE MOST EASTERLY CORNER OF LOT 4 IN SAID BLOCK 25 OF HUBER TRACT; THENCE NORTH 52° 12' WEST ALONG THE NORTHEASTERLY LINE OF SAID LOT 4, A DISTANCE OF 165 FEET, MORE OR LESS, TO THE MOST NORTHERLY CORNER OF SAID LOT 4; THENCE SOUTH 37° 48' WEST ALONG THE NORTHWESTERLY LINE OF SAID LOT 4 AND OF LOT 3 OF BLOCK 25 OF SAID HUBER TRACT, 60 FEET, MORE OR LESS, TO SAID DIVIDING LINE; THENCE SOUTH 52° 12' EAST, ALONG SAID DIVIDING LINE, 165 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

APN: 5144-014-030

**EXHIBIT "B-1"**
**NEGEV LOAN**

1. Loan Agreement
2. Promissory Note
3. Assignment of Leases and Rents
4. Security Instrument -Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
5. Guaranty
6. Borrower's Closing Certificate
7. Borrower's Resolutions
8. Building Laws Indemnity Agreement
9. Hazardous Materials Indemnity Agreement
10. Undelivered Items Letter
11. Pledge and Security Agreement

**EXHIBIT "B-2"**
**SLA LOAN**

1.  Promissory Note
2.  Loan Agreement
3.  Security Instrument -Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
4.  Assignment of Leases and Rents
5.  Guaranty
6.  Hazardous Materials Indemnity Agreement
7.  Building Laws Indemnity Agreement
8.  Borrowers Incumbency Certificate and Resolutions
9.  Borrower's Closing Certificate
10. Undelivered Items letter
11. Pledge Agreement

## EXHIBIT "B-3"
## G&H LOAN

1. Promissory Note
2. Loan Agreement
3. Security Instrument (Greenfield) - Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
4. Security Instrument (Horner Street) - Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
5. Security Instrument (Palm Drive) - Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
6. Hazardous Materials Indemnity Agreement
7. Building Laws Indemnity Agreement
8. Borrower's Closing Certificate
9. Undelivered Items letter

# EXHIBIT "C"
## ALLOCATION OF NEW LOANS PROCEEDS

| SLA Loan | | | | Negev Loan | | | | Guarantor Loan | |
|---|---|---|---|---|---|---|---|---|---|
| Sources | | | | Sources | | | | Sources | |
| Loan | $ 125,000.00 | | | Loan | $ 1,300,000.00 | | | Loan | $ 2,575,000.00 |
| Total Sources | $ 125,000.00 | | | Total Sources | $ 1,300,000.00 | | | Total Sources | $ 2,575,000.00 |
| | | | | | | | | | |
| Uses | | | | Uses | | | | Uses | |
| Interest Reserve SLA Loan | $ 6,927.08 | | | Interest Reserve Negev Loan | $ 72,041.67 | | | Interest Reserve Guarantor Loan | $ 142,697.92 |
| Per Diem SLA Loan (4/19-5/1) | $ 395.83 | | | Per Diem Negev Loan (4/19-5/1) | $ 4,116.67 | | | Per Diem Guarantor Loan (4/19-5/1) | $ 8,154.17 |
| Back Pay Broadway (4/19) | $ 36,605.80 | | | Back Pay Broadway (4/19) | $ 380,700.33 | | | Back Pay Broadway (4/19) | $ 754,079.50 |
| Per Diem Broadway Loan (4/19-5/1) | $ 1,508.23 | | | Per Diem Broadway Loan (4/19-5/1) | $ 15,685.62 | | | Per Diem Broadway Loan (4/19-5/1) | $ 31,069.60 |
| 8-Month IR Broadway Loan | $ 26,394.08 | | | 8-Month IR Broadway Loan | $ 274,498.44 | | | 8-Month IR Broadway Loan | $ 543,718.05 |
| Paydown Broadway Loan | $ 53,168.97 | | | Paydown Broadway Loan | $ 552,957.28 | | | Paydown Broadway Loan | $ 1,095,280.76 |
| | | | | | | | | | |
| Total Uses | $ 125,000.00 | | | Total Uses | $ 1,300,000.00 | | | Total Uses | $ 2,575,000.00 |

**EXHIBIT "D"**
**LIMITED RELEASE**

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC, a Delaware limited liability company ("Lender"), hereby releases:

a.    BROADWAY AVENUE INVESTMENTS LLC, a California limited liability company ("Borrower") from all contractual liability and obligations under the Note and any of the other Loan Documents executed by Borrower in favor of Lender, except as otherwise provided in this Limited Release ("Release").

b.    ALAN GOMPERTS ("Alan"), DANIEL HALEVY ("Daniel") and DAVID HALEVY ("David," and together with Alan and Daniel, individually and collectively, "Guarantor") from all contractual liability and obligations under the Continuing Guaranty and any of the other Loan Documents executed by Guarantor in favor of Lender, except as otherwise provided in this Release.

1.    Notwithstanding the foregoing, the Release shall not apply to and hereby excludes Borrower's obligations and liability under (a) that certain Hazardous Materials Indemnity Agreement, dated July 21, 2021 by Borrower in favor of Lender, (b) Guarantor's obligations and liabilities under clause (g) of "Recourse Amounts" under Section 1 Definitions of the Continuing Guaranty, and (c) any other obligations, liability or indemnity contained in any Loan Document that survives repayment of the Note and any other obligations under the Loan Documents.

2.    Borrower and Guarantor acknowledge and agree that in the event that all or any part of any payment or credit that reduces or pays off the Note or any other obligation under the Loan Documents is declared by a court of competent jurisdiction  declared to be "fraudulent" or "voidable" within the meaning of any state, federal or foreign law relating to fraudulent conveyances, preferential or otherwise voidable or recoverable, in whole or in part, for any reason, under the United States Bankruptcy Code or any other federal, foreign or state law (collectively referred to herein as "Voidable Transfer"), and Lender is required to pay or restore any such Voidable Transfer, or any portion thereof, then this Release shall be null and void, and of no force and effect, unless and until the Note and any such obligations under the Loan Obligations are indefeasibly paid in full.

3.    Any capitalized term not expressly defined in this Release shall have the meaning ascribed to it in that certain Settlement and Loan Modification Agreement by and among Borrower, Guarantor and Lender, dated as of April ___, 2023.

This Release is executed by the undersigned as of the ___ day of _____, 202_.

ARCHWAY REAL ESTATE INCOME FUND I
SPE I, LLC, a Delaware limited liability company

By:_____
Name:_____
Title:_____

# EXHIBIT 4

**OPERATING AGREEMENT**
**OF**
**BROADWAY AVENUE INVESTMENTS, LLC**
**a California limited liability company**

THIS OPERATING AGREEMENT (the "Agreement") of **BROADWAY AVENUE INVESTMENTS, LLC** (the "Company") is entered into and effective as of July 30, 2013, (the "Effective Date") by and among the individuals identified on Exhibit A attached hereto each a "Member" and collectively, the "Members"). Unless otherwise indicated, capitalized words used in this Agreement shall have the meanings specified in Article 13 of this Agreement.

RECITALS:

The Members desire to enter into this Agreement to delineate their rights and liabilities as members, to provide for the Company's management, and to provide for certain other matters, all as permitted under the Beverly-Killea Limited Liability Company Act (the "Act").

AGREEMENT

NOW, THEREFORE, IN CONSIDERATION OF THE MUTUAL PROMISES, COVENANTS AND UNDERTAKINGS HEREIN SPECIFIED AND FOR OTHER GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH ARE HEREBY ACKNOWLEDGED, WITH THE INTENT TO BE OBLIGATED LEGALLY AND EQUITABLY, THE PARTIES HERETO AGREE AS FOLLOWS:

ARTICLE 1
ORGANIZATION

1.1     Formation.  The Members have formed a California limited liability company pursuant to the Act.  Except as expressly provided in this Agreement to the contrary, the Members' rights and obligations and the Company's administration and termination shall be governed by the Act.

1.2     Name.  The Company's name is "BROADWAY AVENUE INVESTMENTS, LLC".

1.3     Manager.  The Company shall be managed by Alan Gomperts (the "Manager").

1.4     Purpose.  Notwithstanding anything to the contrary in the Articles (as defined below), the Company is organized to (i) purchase, own, finance, manage, maintain, improve, operate, sell,

1

exchange, dispose of or otherwise deal with that certain real property located at **737 Broadway Avenue, Los Angeles, CA 90014** (the "Property"), and (ii) engage in and carry on any lawful business purpose or activity which is required to conduct the Business that is not prohibited by the Act or other applicable law.

1.5    Term.  The Company's existence shall continue until dissolved and liquidated pursuant to the provisions of Article 10.

1.6    Office and Registered Agent.  The Company's principal place of business shall be unless changed by mutual consent of the Members.  The name and address of the Company's registered agent for service of process are as specified in the Articles.

1.7    Limited Liability.  Except as otherwise provided expressly in this Agreement or required by law, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that debt, obligation or liability arises in contract, tort, or otherwise.

1.8    Tax Classification.  The Members intend the Company to be classified as a partnership for federal, and to the maximum extent possible, state income taxes.  This classification for tax purposes shall not create or imply a general partnership, limited partnership or joint venture between the Members for state law or any other purpose.  Instead, the Members acknowledge the Company's status as a limited liability company formed under the Act and no Member shall take any action inconsistent with the express intent of the parties to this Agreement.

1.9    Articles of Organization.  The Articles of Organization of BROADWAY AVENUE INVESTMENTS, LLC, a California limited liability company (the "Articles") were filed with the California Secretary of State on March 22, 2010.

ARTICLE 2
CAPITAL CONTRIBUTIONS

2.1    Additional Capital.  The Members understand that additional capital may be required by the Company from time to time during the term of the Agreement for operating expenses and capital expenditures.  If and to the extent that additional cash contributions are needed for the operations of the Company (a "Cash Call"), then the Manager shall advise the Members of such requirement in writing (a "Cash Call Notice") and shall specify the date when the additional capital contributions are due.  If a Member fails to contribute to the Company its share of the applicable cash contribution, then any contributing Member with the prior written consent of Manager may elect either to make a loan to the Company in the amount that should have been contributed by the non-contributing Member or increase its capital contribution by the amount that was to be contributed by the non-contributing Member.  If the contributing Member elects to characterize its advance as a Member loan to the non-contributing Member, then such loan shall bear interest at the maximum rate permitted by law and the principal amount of the Member loan together with all accrued interest thereon shall be repaid to the contributing Member from available cash proceeds that otherwise would have been distributed to the non-contributing Member.  Each Member shall receive a credit to that Member's Capital Account in the amount of

2

any additional capital which that Member contributes to the Company. Immediately following any additional contributions of capital, the Percentage Interests shall be adjusted, and <u>Exhibit A</u> shall be revised to reflect that new relative proportions of the Members' Capital Accounts.

2.3    <u>Capital Accounts</u>. The Company shall establish and maintain an individual capital account ("Capital Account") for each Member in accordance with Regulations section 1.704-1(b) (2) (iv). If a Member Transfers all or a part of that Member's Membership Interest in accordance with this Agreement, such Member's Capital Account attributable to the transferred Membership Interest shall carry over to the new owner of such Membership Interest pursuant to Regulations section 1.704-1(b)(2)(iv)(1).

2.4    <u>No Interest</u>. No Member shall have the right to receive interest on any Capital Contribution or Capital Account balance.

2.5    <u>Return of Capital</u>. Except as otherwise specifically provided in this Agreement, no Member shall have the right to demand the return of, or withdraw, any or all of that Member's Capital Contribution prior to the dissolution and winding up of the Company. No Member guarantees the return of another Member's Capital Contribution. No Member is required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

2.6    <u>Member Loan</u>. No Member shall lend or advance money to or for the Company's benefit without the Manager's prior written consent except as otherwise expressly provided herein. The loan shall not be treated as a Capital Contribution by that Member or entitle that Member to an increase in that Member's Percentage Interest. The loan amount shall be a debt due from the Company, repayable out of the Company's cash, and shall be on such terms as the Company, the Manager and that Member shall agree. Notwithstanding the foregoing, no Member shall be required to make any loans to the Company or guaranty the payment or performance of any Company obligation.

2.7    <u>Manager Loan</u>. The Manager may, in its sole and absolute discretion, lend or advance money to or for the Company's benefit without the Members' consent. The loan shall not be treated as a Capital Contribution by the Manager or entitle the Manager to an increase in its Percentage Interest. The loan amount shall be a debt due from the Company, repayable out of the Company's cash, and shall be on such terms as the Company and the Manager shall agree. Notwithstanding the foregoing, the Manager shall not be required to make any loans to the Company or guaranty the payment or performance of any Company obligation.

ARTICLE 3
MEMBERS

3.1    <u>Members</u>. The name, address, taxpayer identification number and Percentage Interest of each Member are specified on <u>Exhibit A</u> to this Agreement.

3.2    <u>Additional Members</u>. No additional Members may be admitted to the Company without

3

the consent of the Manager, which consent may be withheld for any reason or for no reason. On the admission of an additional Member pursuant to this Section 3.2, each Member (including the additional Member) shall execute an amendment to this Agreement (a) reflecting the Members' new Percentage Interests, and (b) evidencing the additional Member's consent to be bound by the provisions of this Agreement.

3.3    No Withdrawal.  No Member may withdraw, retire or resign from the Company.

ARTICLE 4
MANAGEMENT

4.1    Management.  The business of the Company shall be managed by the Manager. The Manager will devote such time and attention to the business of the Company as may be reasonably necessary to carry out its duties hereunder in the conduct of such business. Except for those decisions defined below as Major Decisions, the management and control of the Company and its business affairs shall rest exclusively with the Manager. Subject to all the terms and conditions hereof, the Manager shall have all the rights and powers which may be possessed by a manager pursuant to the Act and such additional rights and powers otherwise conferred or permissible by law or necessary, advisable or convenient to the discharge of its duties under this Agreement and to the management of the business and affairs of the Company. Without limiting the generality of the foregoing, the Manager shall have the following rights and powers which it may exercise at the cost, expense and risk of the Company:

(i)    To invest the capital of the Company for the benefit of the Company and/or in the exercise of any rights or powers possessed by the Manager hereunder and/or to repay advances of the Company, if any;

(ii)    To open, maintain and close bank accounts and to draw checks and other orders for the payment of money;

(iii)    To employ, on behalf of the Company, legal, financial, accounting, technical and/or operational agents, consultants, employees and other persons as the Manager deems necessary or advisable to carry out the Business of the Company;

(iv)    To execute, sign and deliver in furtherance of any or all purposes of the Company, any and all agreements, contracts, documents, certifications, subscriptions and other instruments necessary, advisable or convenient in connection with the business and affairs of the Company; all of which may contain such terms, provisions and conditions as the Manager, in its sole and absolute discretion, shall deem appropriate;

(v)    To execute, acknowledge and file or deliver all articles of limited liability company, amended articles, instruments or other documents and counterparts thereof and make all filings and recordings and perform all other acts as may be necessary to comply with the laws of the State of California for the formation of the Company, thereafter for the continued good standing of the Company, and, when appropriate, for the termination of the Company;

4

(vi)   To execute such articles, amended articles, certificates, amended certificates, operating agreements and any modifications thereof, and other documents conforming hereto and do such filing, recording, publishing and other acts as may be appropriate to comply with the requirements of law for the formation, reformation, qualification and/or operation of a limited liability company in all jurisdictions where the Company may wish to do business, which shall be accomplished prior to doing business in any such jurisdiction if deemed necessary by the Manager;

(vii)   To execute listing agreements, offers and counteroffers, escrow instructions, deeds and other instruments of transfer and conveyance in connection with the sale of the Property and to cause the Company to borrow funds to finance the acquisition of the Property and the refinance of any indebtedness which is encumbered by the Property from time to time during the term of this Agreement and in connection therewith to execute and deliver loan applications, loan commitments, promissory notes, deeds of trust, other security agreements, financing statements, certificates and resolutions.

(viii)   To borrow money from such banking, lending institutions or other persons or entities (including itself) on behalf of, and in the name of, the Company at such rates of interest as the Manager shall determine to be necessary for any proper Company purpose and to give as collateral therefore all or any part of any Company property;

(ix)   To pay or reimburse any and all costs incurred by the Manager on behalf of the Company;

(x)   To make distributions to the Members at such time and in such manner as it deems appropriate, in the sole exercise of its discretion;

(xi)   To pay or reimburse those out-of-pocket costs and expenses incurred by any Member, including the Manager, on behalf of the Company in connection with providing strategic advice and assistance to the Company;

(xii)   To purchase, at the expense of the Company, liability, errors and omissions and other insurance to protect the Company property and its business as such insurance may be deemed appropriate by the Manager to personally insure the Company and the Manager and any affiliates against liability or losses for such actions taken on behalf of or by the Company, including personal liability and property damage insurance; provided, however, that Manager in its discretion may elect to not procure terrorism or earthquake insurance unless required to do so by a lender;

(xiii)   To employ from time to time, at the expense of the Company, persons (who may include affiliates of the Manager) to render services to the Company including, but not limited to, property management agents or leasing agents, architects, engineers, planners, contractors, accountants and attorneys, including attorneys and accountants who may also act as attorneys and

5

accountants for the Manager, on such terms and for such compensation as is determined by the Manager;

(xiv)    To perform such other acts as the Manager may deem necessary, appropriate or desirable for the furtherance of the purposes of the Company which are not otherwise prohibited by this Agreement or applicable law.

(xv)    To act as "Tax Matters Partner" (as defined in Code section 6231) for all purposes under Internal Revenue Code Section 6231 and to make all tax decisions and elections in respect thereof not mandated by statute, including without limitation the following:  (a) the accounting basis of the Company (cash or accrual basis), selecting or varying depreciation and accounting methods and making other decisions with respect to treatment and various transactions for accounting, bookkeeping or tax purposes; (b) the fiscal year of the Company (calendar year or otherwise); (c) whether and when any tax election shall be taken including the election afforded by Internal Revenue Code Section 754; (d) such amendments to this Agreement as the Manager deems necessary to conform to or benefit from interpretations of present and future interpretations of tax laws and regulations by the judiciary and the U.S. Treasury/Internal Revenue Service and amendments to such laws and regulations; and (e) the determination of the amount of the Company's taxable income and the allocation thereof amongst the Members.  The Manager may amend this Agreement without the vote of the Members from time to time upon the advice of tax and accounting professionals to conform this Agreement to federal and state tax law and to the intent of the Members expressed hereby that the tax implications of this Agreement (as expressed by, amongst other things, the provisions of this Agreement which allocate taxable profit and loss) be consistent with (to the extent possible) the economic implications of this Agreement (as expressed by, amongst other things, the provisions of this Agreement which provide for distributions of cash and payment of preferred returns or yields to Members).

4.2    Major Decisions.  The following events constitute Major Decisions requiring the affirmative vote or consent of a majority of the members: (i) to merge the Company with any other limited liability company, limited partnership, general partnership, limited liability partnership, or corporation (ii) the dissolution of the Company (iii) to sell the Property and (iv) the acquisition of any real property other than the Property or the guaranty by this Company of any debt which is unrelated to the acquisition, operation or improvement of the Property.

4.3    Member Meetings and Approval.  No annual or regular meetings of the Members are required.  If meetings are held, such meetings shall be noticed, held and conducted pursuant to the Act.  Any action required or permitted to be taken by the Members may be taken by the written consent of Members having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all Members entitled to vote on that action at a meeting were present and voted.

4.4    Indemnification.  The Company shall indemnify, defend, and hold harmless the Manager from and against any and all liabilities of every kind, arising from or relating to the Company's

business, except as to those matters arising from such Manager's fraud, gross negligence, willful misconduct, or breach of fiduciary duty.

4.5    <u>Special and Limited Power of Attorney</u>.

(i)    The Manager shall, at all times during the existence of the Company, have a special and limited power of attorney as the attorney-in-fact for each Member, with power and authority to act in the name and on the behalf of each such Member to execute, acknowledge, file, record and swear to in the execution, acknowledgment, filing and recording of documents, which shall include but not be limited to:  (a)  this Agreement, any separate certificates of limited liability company, as well as any amendments to the foregoing which, under the laws of the State of California or the laws of any other state, are required to be filed or which the Manager deems it advisable to file; (b) any other instrument or document which may be required to be filed by the Company  under the laws of any state or by any governmental agency or which the Manager deems it advisable to file; and (c) any instrument or document which may be required to effect the continuation of the Company  , the admission of additional or substituted Members, or the dissolution and termination of the Company   (provided such continuation, admission or dissolution and termination are in accordance with the terms of this Agreement), or to reflect any reductions in amount of contributions of Members.

(ii)    This special and limited power of attorney:  (a)  is a special power of attorney coupled with an interest, is irrevocable, shall survive the death of the granting Member, and is limited to those matters herein set forth; (b) may be exercised by the Manager for each of the Members by the signature of the Manager acting as attorney-in-fact for all of the Members, together with a list of all Members executing such instrument by their attorney-in-fact; and (c) shall survive an assignment by a Member of all or any portion of his or her Interests except that, where the assignee of Interests owned by a Member has been approved by the Manager for admission to the Company  as a substituted Member, the special power of attorney shall survive such assignment for the sole purpose of enabling the Member to execute, acknowledge and file any instrument or document necessary to affect such substitution.

ARTICLE 5
DISTRIBUTIONS

5.1    <u>Distributions of Available Cash</u>.  Not less frequently than quarterly, the Manager shall cause the Company to distribute to the Members all Available Cash of the Company, whether derived from operations or capital transactions.  As used herein, "Available Cash" means the amount of cash which the Manager deems available for distribution to the Members, after taking into account (a) the Company's current financial obligations, (b) anticipated Company expenditures, and (c) those amounts the Manager deems commercially reasonable and necessary to withhold as reserves for the Company's usual and customary expenses.  Available cash shall be distributed to the Members *pro rata* according to their respective Percentage Interests.

5.2    <u>Tax Withholding</u>.  If any federal, foreign, state or local jurisdiction requires the Company to withhold taxes or other amounts with respect to any Member's allocable share of net profits, or with respect to distributions, the Company shall withhold from distributions or other amounts

7

then due to such Member (or shall pay to the relevant taxing authority with respect to amounts allocable to such Member) an amount necessary to satisfy the withholding responsibility. In each such case, the Member for whom the Company has paid the withholding tax shall be deemed to have received the withholding distribution or other amount so paid, and to have paid the withholding tax directly.

## ARTICLE 6
## TAX ALLOCATIONS

6.1    Tax Allocations.  All items of Company income, gain, loss or deduction shall be allocated for federal, state and local income tax purposes to the Members, pro rata, in accordance with their respective Percentage Interests.

6.2    Qualified Income Offset.  If any Member unexpectedly receives an adjustment, allocation, or distribution that results in a deficit balance in such Member's Capital Account, there shall be allocated to that Member items of Company income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible.

## ARTICLE 7
## ACCOUNTING AND BANKING

7.1    Books and Records.  The Manager shall cause the Company to keep proper and complete books of account of the Company's business ("Records").  The Records shall be kept at the Company's principal place of business and shall be open to inspection by any of the Members or their authorized representatives at any reasonable time during business hours.  The accounting records shall be maintained in accordance with generally accepted bookkeeping practices for the Company's type of business.  The Company shall maintain at its principal office all records required to be maintained by the Company pursuant to the Act.

7.2    Bank Accounts.  The Manager shall cause the Company's funds to be maintained in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of the Members or any other Person.  Checks or drafts drawn on the Company's accounts shall require the signature of Manager.

7.3    Tax Returns.  The Manager shall cause to be prepared at least annually, at Company expense, information necessary for the preparation of the Members' federal and state income tax returns.  The Company shall send or cause to be sent to each Member within ninety (90) days after the end of each taxable year (i) such information as is necessary to complete federal and state income tax or information returns, and (ii) a copy of the Company's federal, state, and local income tax or information returns for that year.

ARTICLE 8
TRANSFER OF MEMBERSHIP INTERESTS

8.1    General Prohibition.  The Members do not want any Membership Interest to be made generally available to persons or entities other than the present Members.  Accordingly, except for Permitted Transfers (defined below) no Member may Transfer all or any part of his Membership Interest except with the prior approval of the Manager, which approval may be given or withheld in the sole discretion of the Manager.  Transfers in violation of this Section 8.1 shall be void ab initio.  After the consummation of any permitted Transfer of any part of a Membership Interest, the Membership Interest so Transferred shall continue to be subject to the provisions of this Agreement and any further Transfers shall be required to comply with all of the provisions of this Agreement.  Each Member acknowledges the reasonableness of this prohibition in view of the purposes of the Company and the relationship of the Members.

8.2    Permitted Transfers.  A Member may Transfer all or any part of that Member's Membership Interest in trust for the benefit of that Member, or that Member's spouse, children, grandchildren, siblings or in-laws, or any combination thereof, provided (a) the Member is a trustee or co-trustee of the trust, and (b) such Member, as trustee or co-trustee, agrees in writing to be bound by the provisions of this Agreement ("Permitted Transfer").

8.3    Transferee as a Member.  An Assignee of a Membership Interest shall have the right to become a substitute Member only if (i) the Manager consented to the Assignee's admission to the Company as a Member, (ii) the Assignee executes an instrument satisfactory to the Members accepting and adopting the provisions of this Agreement, and (iii) the Assignee pays any reasonable expenses in connection with his admission as a new Member.  The admission of an Assignee as a substitute Member shall not release the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

8.4    Transfers In Violation Of Agreement.  Upon any Transfer of a Membership Interest in violation of this Article 8, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member.  Such transferee shall only be entitled to become an Assignee and thereafter shall only receive the share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest (defined below) would otherwise be entitled.  Notwithstanding the immediately preceding sentences, if, in the determination of the Company's legal counsel, a Transfer in violation of this Article 8 would cause the tax termination of the Company under Code section 708(b)(1)(B), the Transfer shall be null and void and the purported transferee shall not become either a Member or an Assignee.

ARTICLE 9
OPTIONAL PURCHASE EVENTS

9.1    Optional Purchase Event Defined.  An "Optional Purchase Event" means, with respect to any Member, any one or more of the following: (a) the death, Disability or Bankruptcy of a Member; (b) the withdrawal, retirement or resignation of a Member in violation of Section 3.3 of

9

this Agreement; (c) the Member becomes a terminated Member; (d) the occurrence of any event that is, or would cause, a Transfer in contravention of this Agreement; or (e) the Member files an action seeking a decree of judicial dissolution pursuant to Act section 17351.

9.2     Purchase Option.  Upon the occurrence of an Optional Purchase Event with respect to any Member (the "Selling Member"), the other Members ("Purchasing Members") shall have the option to purchase the Selling Member's Membership Interest ("Selling Member's Interest").  If such option is exercised, the Selling Member, or such Selling Member's legal representative shall sell the Selling Member's Interest as provided in this Article 9.  Each Member who causes an Optional Purchase Event or to whom an Optional Purchase Event occurs, shall provide prompt notice of the Optional Purchase Event to the other Members.

9.3     Purchase Price.  The purchase price for the Selling Member's Interest shall be the fair market value of the Selling Member's Membership Interest as determined by an independent appraiser jointly selected by the Selling Member (or the Selling Member's legal representative) and the Purchasing Member.

If the Selling Member (or the Selling Member's legal representative) and the Purchasing Member are unable to agree on the selection of an appraiser within thirty (30) days after the Optional Purchase Event, each shall select an independent appraiser within twenty (20) days after expiration of the thirty (30) day period.  The two appraisers so selected shall each independently appraise the Selling Members Interest and, as long as the difference in the two appraisals does not exceed five percent (5%) of the lower of the two appraisals, the fair market value shall be conclusively deemed to equal the average of the two appraisals.  The determination of such appraisers shall be binding on the parties. If either party fails to select an independent appraiser within the time required by this Section 9.3, the fair market value of the Selling Member's Interest shall be conclusively deemed to equal the appraisal of the independent appraiser timely selected by the other.

If the difference between the two appraisals referred to above exceeds five percent (5%) of the lower of the two appraisals, the two appraisers selected shall select a third appraiser who shall also independently appraise the Selling Member's Membership Interest.  In such case the fair market value of the Selling Member's Membership Interest shall be the average of the two closest appraisals.  The determination of such appraisers shall be binding on the parties and not subject to judicial review or review by arbitration.  The Company and the Selling Member shall each pay one-half of the cost of the third appraisal.

In determining the fair market value, the appraisers appointed under this Agreement shall consider all opinions and relevant evidence submitted to them by the parties, or otherwise obtained by them, and shall set forth their determination in writing together with their opinions and the considerations on which the opinions are based, with a signed counterpart to be delivered to each party, within sixty (60) days after commencing the appraisal.

Notwithstanding the foregoing, if the Optional Purchase Event results from a breach of this Agreement by the Selling Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Purchasing Member as a result of such breach.

9.4    Notice of Intent to Purchase.  Within five (5) business days after the Selling Member receives the appraisals from which the purchase price of the Selling Member's Interest can be determined, the Selling Member shall notify the Purchasing Member of such price.  Within thirty (30) days after the Selling Member has notified the Purchasing Member of the purchase price of the Selling Member's Interest, the Purchasing Member shall notify the Member in writing of the Purchasing Member's desire to purchase the Selling Member's Interest.  The failure of the Purchasing Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Selling Member's Interest.  The Purchasing Member may assign to the Company or any other Person that Member's right to purchase the Selling Member's Interest.  For convenience, the party or parties purchasing the Selling Member's Interest hereunder shall be referred to collectively as the "Purchasers" and individually as a "Purchaser."

9.5    Election to Purchase Less Than All of the Selling Member's Interest.  If the Purchasers do not elect to purchase all of the Selling Member's Interest, the portion of the interest not purchased shall be an Economic Interest only.

9.6    Payment of Purchase Price.  The purchase price shall be paid by the Purchasers by either of the following methods, each of which may be selected separately by each Purchaser:

9.6.1    At the Closing (defined below), each Purchaser shall pay in cash the total purchase price for the Selling Member's Interest; or

9.6.2    Except as otherwise provided in Section 9.6.3, at the Closing (defined below), each Purchaser shall pay one-fifth (1/5) of the purchase price in cash ("Down Payment") and the balance of the purchase price (the "Loan") shall be paid in arrears in equal monthly installments over a four-year period, based on a forty-eight (48) month schedule, plus accrued interest at the Prime Rate.  The Loan shall be evidenced by separate promissory notes (each, a "Note") executed by each Purchaser, as applicable.  Each Note shall be in an original principal amount equal to the portion owed by the Purchaser.  The Purchaser shall have the right to prepay the Note in full or in part at any time without penalty.  The Note shall contain customary terms, including a provision for the payment of attorneys' fees if litigation is commenced to enforce the Note.  Any Note made by a Purchaser shall be secured by a pledge of that portion of the Selling Member's Interest purchased by the Purchaser; and, if the Purchaser is not a natural person, then the beneficial owners of the Purchaser shall guarantee personally the Purchaser's payment obligations under the Note.

9.6.3    Notwithstanding anything to the contrary in Section 9.6.2, if the event giving rise to the purchase of a Selling Member's Interest is the death of the Selling Member, the Down Payment shall be increased to the amount of insurance proceeds actually received by the Company from life insurance policies owned by the Company insuring that Selling Member's

life; provided, however, at no time shall the Down Payment exceed the purchase price
determined pursuant to Section 9.3.

9.7    <u>Closing of Purchase of Selling Member's Interest</u>.  Unless Court approval is required, the
closing ("Closing") for the sale of a Selling Member's Interest pursuant to this Article 9 shall be
held at 10:00 a.m. at the principal office of Company no later than sixty (60) days after the
determination of the purchase price, except that if the Closing date falls on a Saturday, Sunday,
or legal holiday, then the closing shall be held on the next succeeding business day. If Court
approval is required, (a) the Closing of the sale of a Selling Member's Interest shall occur not
later than five (5) business days after entry of the order approving such sale, (b) the Company
shall file the application seeking Court approval within thirty (30) days following the
determination of the purchase price, and (c) the parties to the Court proceeding shall make every
effort to obtain the Court's approval in an expeditious manner.

At the Closing, the Selling Member shall deliver to each Purchaser an instrument of
transfer (containing warranties of title and no encumbrances) conveying the Selling Member's
Interest.  The Selling Member and each Purchaser shall do all things and execute and deliver all
papers as may be reasonably necessary fully to consummate such sale and purchase in accordance
with the terms and provisions of this Agreement.

ARTICLE 10
DISSOLUTION AND "WINDING UP"

10.1    <u>Company Dissolution</u>.  The Company shall be dissolved, its assets disposed of, and its
affairs wound up on the first to occur of the following (each, a "Dissolution Event"): (a) the vote
of all of the Members; (b) the happening of any event that makes it unlawful or impossible to
carry on the business of the Company; or (c) the sale of all or substantially all of the assets of the
Company. Except as expressly permitted in this Agreement, a Member shall not take any
voluntary action that directly causes a Dissolution Event.

10.2    <u>Winding Up</u>.  On the Company's dissolution, the Company's assets shall be disposed of
and its affairs wound up.  The Company shall give written notice of the commencement of the
dissolution to all of its known creditors.

10.3    <u>Liquidating Distributions</u>.  After determining that all the known debts and liabilities of
the Company have been paid or adequately provided for, the Company shall distribute its
remaining assets to the Members in accordance with their positive Capital Account balances,
after taking into account income and loss allocations for the Company's taxable year during
which liquidation occurs.  Such liquidating distributions shall be made by the end of the
Company's taxable year in which the Company is liquidated, or if later, within (90) days after the
date of such liquidation.

10.4    <u>Limitations on Payments Made in Dissolution</u>.  Except as otherwise specifically provided
in this Agreement, each Member shall only be entitled to look solely to the assets of the
Company for the return of that Member's positive Capital Account balance and shall have no

12

recourse for such Member's Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against any other Member.

## ARTICLE 11
## INVESTMENT REPRESENTATIONS

Each Member represents and warrants to, and agrees with, the other Members and the Company as follows:

11.1   Preexisting Relationship Or Experience.  (i) The Member has a preexisting personal or business relationship with the Company or one or more of its officers or control persons, or (ii) by reason of the Member's business or financial experience, or by reason of the business or financial experience of the Member's financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, the Member is capable of evaluating the risks and merits of an investment in a Membership Interest and of protecting the Member's own interests in connection with this investment.

11.2   No Advertising.  The Member has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, newspaper or magazine article or advertisement, radio or television advertisement, or any other form of advertising or general solicitation with respect to the sale of the Membership Interest.

11.3   Investment Intent.  The Member is acquiring the Membership Interest for investment purposes for the Member's own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interest.  No other Person will have any direct or indirect beneficial interest in or right to the Membership Interest.

## ARTICLE 12
## MISCELLANEOUS

12.1   Complete Agreement.  This Agreement and the Articles constitute the complete and exclusive agreement of the parties regarding the subject matter of this Agreement, and replace and supersede all prior written and oral agreements or statements by and among the Members. No representation, statement, condition or warranty not contained in this Agreement shall be binding on the Members or have any force or effect whatsoever.  To the extent that any provisions of the Articles conflict with any provision of this Agreement, the Articles shall control.  All amendments to this Agreement shall be in writing and signed by all of the Members.

12.2   Binding Effect.  Subject to the provisions of this Agreement relating to transferability, this Agreement shall be binding on, and inure to the benefit of, the parties and their respective heirs, personal and legal representatives, executors, administrators, successors and assigns.

12.3   Parties In Interest.  Except as expressly provided in the Act, nothing in this Agreement shall (a) confer any rights or remedies under or by reason of this Agreement on any Persons other

13

than the Members and such Members' respective successors and assigns, (b) relieve or discharge
the obligation or liability of any third person to any party to this Agreement, or (c) give any third
person any right of subrogation or action over or against any party to this Agreement.

12.4    Headings.  All headings herein are inserted only for convenience and ease of reference
and are not to be considered in the construction or interpretation of any provision of this
Agreement.

12.5    Interpretation.  If any claim is made by any Member relating to any conflict, omission or
ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied
because this Agreement was prepared by or at the request of a particular Member or that
Member's counsel.

12.6    Governing Law.  This Agreement is governed by and shall be construed in accordance
with the laws of the state of California, excluding any conflicts-of-laws rule or principle that
might refer the governance or the construction of this Agreement to the law of another
jurisdiction.

12.7    Severability.  If any provision of this Agreement or its application to any Person or
circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and
the application of such provision to other Persons or circumstances is not affected and such
provision shall be enforced to the greatest extent permitted by law.

12.8    Specific Performance.  The Members agree that irreparable damage will result if this
Agreement is not performed in accordance with its terms, and the Members agree that any
damages available at law for a breach of this Agreement would not be an adequate remedy.
Therefore, the provisions hereof and the obligations of the Members hereunder shall be
enforceable in a court of equity, or other tribunal with jurisdiction, .by a decree of specific
performance, and appropriate injunctive relief may be applied for and granted in connection
therewith.  Such remedies and all other remedies provided for in this Agreement shall, however,
be cumulative and not exclusive and shall be in addition to any other remedies that a Member
may have under this Agreement, at law or in equity.

12.9    Further Assurances.  Each Member agrees to execute and deliver such additional
documents and instruments and to perform such additional acts as may be necessary or
appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of
this Agreement and the transactions contemplated hereby.

12.10    Notices.  Any notice, demand, consent, election, offer, approval, request, or other
communication (collectively, "Notice") given under this Agreement shall be in writing and shall
be served personally or delivered by first class, registered or certified, return receipt requested,
U.S. mail, postage prepaid.  Notices may also be given by transmittal over electronic transmitting
devices such as facsimile or telecopy machine, if the party to whom the notice is being sent has
such a device in its office, and provided a complete copy of any notice so transmitted shall also
be mailed in the same manner as required for a mailed notice.  Notices shall be deemed received

14

at the earlier of actual receipt or three (3) days following deposit in U.S. mail, postage prepaid. Notices shall be directed to the Company at the Company's principal place of business as specified in Section 1.3 of this Agreement, and to a Member at the addresses shown on Exhibit A: provided that a Member may change such Member's address for notice by giving written Notice to all other Members in accordance with this Section 11.10.

12.11    No Interest In Company Property: Waiver Of Action For Partition.  No Member or Assignee has any interest in specific property of the Company: Without limiting the foregoing, each Member and Assignee irrevocably waives during the term of the Company any right that such Member or Assignee may have to maintain any action for partition with respect to the property of the Company.

12.12    Counterparts.  This Agreement may be executed in any number of counterparts with the same effect as if all signatories had signed the same document.  All counterparts shall be construed together and constitute the same instrument.

12.13    Attorney's Fees.  If any dispute between the Company and the Members or among the Members results in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party.

12.14    Remedies Cumulative.  The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

12.15    Consent Of Spouse.  Within ten (10) days after any individual becomes a Member or a Member marries, such Member shall have his or her spouse execute a consent substantially in the form of Exhibit B attached to this Agreement.

ARTICLE 13
DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings specified below or elsewhere in this Agreement and when not so defined shall have the meanings specified in Act section 17001 (such terms are equally applicable to both the singular and plural derivations of the terms defined):

"Affiliate" means any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member.  The term "control," as used in the immediately preceding sentence, shall mean with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

15

"Assignee" means the owner of an Economic Interest who has not been admitted as a substitute Member in accordance with Section 8.3.

"Bankruptcy" means: (a) the filing of an application by a Member for, or his consent to, the appointment of a trustee, receiver, or custodian of his other assets; (b) the entry of an order for relief with respect to a Member in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time; (c) the making by a Member of a general assignment for the benefit of creditors; (d) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of a Member unless the proceedings and the person appointed are dismissed within ninety (90) days; or (e) the failure by a Member generally to pay his debts as the debts become due within the meaning of section 303(h)(l) of the United States Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of his inability to pay his debts as they become due.

"Economic Interest" mean the right to receive distributions of the Company's assets and allocations of income, gain, loss, deduction, credit and similar items from the Company pursuant to this Agreement and the Act, but shall not include arty other rights of a Member, including, without limitation, the right to vote or participate in the management of the Company, or except as provided in Act section 17106, any right to information concerning the business and affairs of the Company.

"Membership Interest" shall mean a Member's entire interest in the Company including the Member's Economic Interest, the right to vote on or participate in the management, and the right to receive information concerning the business and affairs, of the Company.

"Net Profits" and "Net Losses" shall mean the income, gain, loss and deductions of the Company in the aggregate or separately stated, as appropriate, determined in accordance with the method of accounting at the close of each fiscal year on the Company's tax return filed for federal income tax purposes.

"Percentage Interest" shall mean the percentage set forth next to a Member's name on Exhibit A.

"Person" means an individual, partnership, limited partnership, limited liability company, corporation, trust, estate, association or any other entity.

"Prime Rate" as of a particular date shall mean the prime rate of interest as published on that date in the Wall Street Journal, and generally defined therein as "the base rate on corporate loans posted by at least 75% of the nation's 30 largest banks." If the Wall Street Journal is not published on a date for which the Prime Rate must be determined, the Prime Rate shall be the prime rate published in the Wall Street Journal on the nearest-preceding date on which the Wall Street Journal was published.

"Transfer" or "Transferred" shall mean any sale, assignment, transfer, conveyance, pledge, hypothecation, or other disposition voluntarily or involuntarily, by operation of law, with

16

or without consideration, or otherwise (including, without limitation, by way of intestacy, will, gift, bankruptcy, receivership, levy, execution, charging order or other similar sale or seizure by legal process) of all or any portion of any Membership Interest.

Without limiting the generality of the foregoing, the sale or exchange of at least fifty percent (50%) of the voting stock of a Member, if a Member is a corporation, or the Transfer of an interest or interests of at least fifty percent (50%) in the capital or profits of a Member (whether accomplished by the sale or exchange of interests or by the admission of new partner or members), if a Member is a partnership or limited liability company, or the cumulative Transfer of such interests in a Member which effectively equal the foregoing (including Transfer of interests followed by the incorporation of a Member and subsequent stock Transfer, or Transfers of stock followed by the liquidation of a Member and subsequent Transfers of interests) will be deemed to constitute a Transfer of the Member's entire Membership Interest.

[Signatures Begin On The Next Page]

**EXHIBIT A**
to
**Operating Agreement**

| Name | Address | Capital Contribution | Percentage Interest |
|---|---|---|---|
| David and Sue Halevy | 257 S. Linden Drive Beverly Hills, CA 90211 | $158,333.00 | 33.33% |
| Alan and Sharon Gomperts | 264 S. Oakhurst Drive Beverly Hills, CA 90210 | $158,333.00 | 33.33% |
| Daniel Halevy | 133 S. Palm Drive Beverly Hills, CA 90211 | $158,333.00 | 33.33% |
| | | | |
| | **Total** | **$475,000.00** | **100%** |

**IN WITNESS WHEREOF**, the Members have executed this Agreement on the day and year first above written.

**"MANAGER"**

Alan Gomperts, Manager

**"MEMBERS"**

David Halevy

Alan Gomperts

Daniel Halevy

18

# EXHIBIT B

## ASSIGNMENT OF LOAN DOCUMENTS

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, **ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC fka ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC**, a Delaware limited liability company ("***Assignor***"), does hereby sell, transfer and assign to **ARCHWAY BROADWAY LOAN SPE, LLC**, a Delaware limited partnership ("***Assignee***"), all of Assignor's right, title and interest in and to the documents, instruments and agreements listed on Exhibit A, attached hereto and incorporated herein by this reference, (collectively, the "***Loan Documents***").  It is the intention of Assignor to transfer and assign to Assignee all of the right, title and interest, benefits and obligations and duties held by Assignor in, to and under the Loan Documents and the loan evidenced thereby.

IN CONNECTION THEREWITH, Assignee hereby accepts the foregoing assignment and hereby assumes all of the duties, obligations and liabilities of Assignor under and with respect to the loan as evidenced by the Loan Documents.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Assignor and Assignee have duly executed this Assignment of Loan Documents to be effective as of the date set forth below.

Date: As of September 30, 2024

**ASSIGNOR:**

**ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC fka ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,**
a Delaware limited liability company

By: _____
Name: Bobby Khorshidi
Title: Authorized Signatory

**ASSIGNEE:**

**ARCHWAY BROADWAY LOAN SPE, LLC,**
a Delaware limited partnership

By: _____
Name: Bobby Khorshidi
Title: Authorized Signatory

EXHIBIT A
LOAN DOCUMENTS

1) Assignment of Leases and Rents, dated as of July 21, 2021, made by **BROADWAY AVENUE INVESTMENTS LLC**, a California limited liability company ("***Broadway***"), as assignor, in favor of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company ("***Lender***"), as assignee, and recorded July 26, 2021, as Document No. 20211142010 in the official records of Los Angeles County, California.

2) Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of July 21, 2021, made by Broadway, as borrower, in favor of Lender, as beneficiary, and recorded July 26, 2021, as Document No. 2021142009 in the official records of Los Angeles County, California.

3) Borrower Closing Certificate, dated July 21, 2021, executed by Broadway in favor of Lender.

4) Building Laws Indemnity Agreement, dated July 21, 2021, executed by Broadway in favor of Lender.

5) Continuing Guaranty, dated July 21, 2021, executed by **ALAN GOMPERTS,** an individual, **DANIEL HALEVY,** an individual, and **DAVID HALEVY,** an individual ("***Guarantor***"), in favor of Lender.

6) Hazardous Material Indemnity Agreement, dated July 21, 2021, executed by Broadway in favor of Lender.

7) Loan Agreement, dated July 21, 2021, executed by Broadway and Lender.

8) Promissory Note dated July 21, 2021, in the original amount of $16,942,500.00, made by Broadway, and payable to the order of Lender.

9) UCC Financing Statement filed with the California Secretary of State's Office; and

10) All other instruments and agreements executed in connection with any of the foregoing in or under which Lender has any right, title or interest.

## ALLONGE

FOR VALUE RECEIVED, the undersigned, **ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC fka ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC**, a Delaware limited liability company ("***Archway***"), the original payee under that certain Promissory Note, dated as of July 21, 2021, in the original principal amount of $16,942,500.00, made by **BROADWAY AVENUE INVESTMENTS LLC**, a California limited liability company ("***Borrower***"), and payable to the order of Archway (the "***Note***"), to which this endorsement is affixed, absolutely assigns, transfers, endorses, negotiates, and sets over to and makes payable to the order of **ARCHWAY BROADWAY LOAN SPE, LLC**, a Delaware limited liability company ("("***Archway Broadway***"), its successors and assigns, the Note, without recourse, representation or warranty of any kind, except as and to the extent set forth in the Assignment of Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing from Archway to Archway Broadway, dated on or about the hereof. This assignment includes the Note, all interest, principal, and other sums due or to become due under the Note, and all other rights of any nature accrued or to accrue under the Note.

Dated: September 18, 2024

**ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC, formerly known as ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,**
a Delaware limited liability company

By: _____
Name: Bobby Khorshidi, a.k.a. Babak Khorshidi
Title: Authorized Officer and Agent